**Robert L. HOMER and Lynne K. Homer, Plaintiffs–Appellants,**

v.

**Rymantas GUZULAITIS, Shirley Guzulaitis, Guzulaitis, Inc., and Arsenal Savings & Loan, Defendants–Appellees.**

**No. 49A04–8904–CV–141.[1]**

Court of Appeals of Indiana, First District.

Feb. 28, 1991.

---

**1.** This case was reassigned to this office on January 2, 1991.

James S. Kowalik, Stephen S. Pierson, Hostetler & Kowalik, Indianapolis, for plaintiffs-appellants.

Michael S. Miller, Paul F. Lottes, Mendelson, Kennedy, Miller, Muller & Hall, Indianapolis, for defendants-appellees.

BAKER, Judge.

Plaintiff-appellants Robert L. and Lynne K. Homer, husband and wife, (the Homers) brought a foreclosure action against defendant-appellees Rymantas and Shirley Guzulaitis, husband and wife, Guzulaitis, Inc., and Arsenal Savings & Loan (collectively, the Guzulaitises). The Guzulaitises brought a counterclaim for fraud. The trial court denied all relief to the Homers and entered judgment for the Guzulaitises on their counterclaim.

The Homers raise several issues for our review, many of which concern the sufficiency of the evidence to sustain the judgment. Accordingly, we have consolidated and restated the issues as follows:

I. Whether parol evidence was admissible to show fraudulent intent.

II. Whether the evidence of fraud in the inducement is sufficient to support the judgment.

III. Whether Minnesota's election of remedies rules mandate reversal of the trial court's judgment.

IV. Whether the award of punitive damages was justified.

We affirm.

## FACTS

The Guzulaitises are an Indianapolis couple who were unschooled in the world of business or its pitfalls prior to the transactions underlying this litigation. In the spring of 1984, they decided to leave Indianapolis' urban environment and purchase a resort/retreat somewhere in the north country—Michigan, Wisconsin, or Minnesota. To make the move a successful venture, the Guzulaitises determined they would have to purchase a business with sufficient cash flow to pay expenses, cover debt service, and provide enough remaining income to support themselves and their family.

In the spring of 1985, the Guzulaitises met Homer, who along with his wife, owned the Bowstring fishing and camping resort in Minnesota. Bowstring consisted of several cabins on a lake with approximately seven acres of land. Prior to 1985, the resort included a lodge where food and beverages were sold. The lodge, however, was destroyed by fire in November 1984.

Homer expressed an interest in selling the resort, and on September 20 of 1985, the Guzulaitises received a letter from Homer stating that he and his wife had done over $100,000 in gross annual receipts before the lodge burned down. In October 1985, the Guzulaitises went to Minnesota to visit the Bowstring resort, and Homer told them that yearly income from cabin rental was between $60,000 and $65,000, while boat rentals, bait sales, and other ancillary areas generated roughly $10,000 in annual income. The Guzulaitises told Homer they needed to be able to support themselves from the income of the resort. Homer assured them the resort had paid for itself with its proceeds and that neither he nor his wife had been required to take outside employment to make ends meet.

At a meeting between Homer and the Guzulaitises in Michigan City in November 1986, Homer disclosed written financial information revealing $62,000 in annual cabin rental income and approximately $10,000 in income from boat rental and other ancillary sources. According to Homer, the occupancy rate of the cabins was approximately 75%. Homer, however, refused to produce any income records; he simply had figures written on a sheet of paper.

In fact, during the period when Homer said the resort was grossing over $100,000

per year, the business was experiencing an annual shortfall of approximately $40,000. Additionally, the losses were so great that Homer and his wife had to take out a loan and use the funds from an inheritance to survive while operating the resort.

Before purchasing the resort, the Guzulaitises decided to have an appraisal performed. Homer refused to give the appraiser any income information, so the appraiser eventually estimated a 70% occupancy rate for the cabins.

The Guzulaitises bought the resort on land contract in March 1986 for $270,000, making a down payment of $30,000. Prior to closing, Homer cryptically told the maintenance man who lived at the resort to be prepared to lock the Guzulatises out after the sale. At closing, Homer was to deliver advance deposits, customer files, and receipts to the Guzulaitises. He failed to do so.

A few weeks after closing, the Homers held an auction and sold personal property the Guzulaitises believed was part of the resort according to an asset purchase agreement signed by the Homers and the Guzulaitises. The maintenance man testified the items sold at the auction were needed for the operation of the resort; they were not the Homers' personal effects.

When Mr. Guzulaitis went to Minnesota in May to prepare the resort for the 1986 summer season, the reservation records he found revealed the resort never generated and could not generate the income stream and occupancy rate Homer had represented.

In early June 1986, the Homers brought suit in Minnesota to cancel the sale because the Guzulaitises were late in reimbursing them for an insurance premium of $231.28. Later that month, the Homers filed this action, demanding payment on a promissory note and foreclosure of a mortgage on the Guzulaitises' Indiana home the Guzulaitises had given as security for the purchase of the resort.

The Guzulaitises brought a counterclaim for fraud, breach of contract, conversion, and unjust enrichment. After a trial to the bench, the trial court entered thoughtful and detailed findings of fact and conclusions of law. The court denied any recovery to the Homers, rescinded the various agreements between the Homers and the Guzulaitises, and awarded the Guzulaitises their out of pocket damages of $60,772.35 and $20,000 in punitive damages.

## DISCUSSION AND DECISION

█ At the outset, we note the parties agree Minnesota substantive law controls disposition of the case. When the parties to a contract agree on the law which should control the contract, we will give effect to their agreement. *Chalmers & Williams v. Surprise* (1919), 70 Ind.App. 648, 123 N.E. 841. At the same time, Indiana procedural law applies. *Staple v. Richardson* (1966), 140 Ind.App. 20, 212 N.E.2d 904. Because the trial court entered detailed findings of fact and conclusions of law, we will reverse the judgment only if it is clearly erroneous. *Day, et al. v. Ryan* (1990), Ind.App., 560 N.E.2d 77.

### I

█ The Homers argue the trial court erred in admitting the statements Homer made regarding the financial success of the resort. Minnesota takes a dim view of fraudulent inducement to contract, and accordingly allows parol evidence to explain fraud surrounding a written contract, even if that contract contains an integration clause. *Rosenquist v. Baker* (1948), 227 Minn. 217, 35 N.W.2d 346; *Stromberg v. Smith* (1988), Minn.App., 423 N.W.2d 107; *Johnson Bldg. Co. v. River Bluff Development* (1985), Minn.App., 374 N.W.2d 187, *pet. for rev. denied.* The trial court properly admitted Homer's statements.

### II

The Homers next argue the judgment is contrary to the evidence and law because there was no showing of fraud. We disagree. The Minnesota Supreme Court has set out the following elements of fraud.

1. There must be a representation;

2. That representation must be false;

3. It must have to do with a past or present fact;

4. That fact must be material;

5. It must be susceptible of knowledge;

6. The representer must know it to be false, or in the alternative, must assert it as of his own knowledge without knowing whether it is true or false;

7. The representer must intend to have the other person induced to act, or justified in acting upon it;

8. That person must be so induced to act or so justified in acting;

9. That person's action must be in reliance upon the representation;

10. That person must suffer damage;

11. That damage must be attributable to the misrepresentation, that is, the statement must be the proximate cause of injury.

*Davis v. Re–Trac Manufacturing Corp.* (1967), 276 Minn. 116, 149 N.W.2d 37, 38–39.

■ Homer represented the resort would bring in approximately $65,000 in cabin rental annually, and that with the lodge intact, the resort had gross annual receipts of over $100,000. As was later discovered at trial, these representations were false.[2] In *Spiess v. Brandt* (1950), 230 Minn. 246, 41 N.W.2d 561, a case remarkably similar to the present one, the Minnesota Supreme Court held statements regarding profitability of a business were material for purposes of establishing fraud. Moreover, while Homer was not obliged to give any representations about the profitability of the resort, he was under a clear duty not to make any misrepresentations. *See id.; L & H Airco, Inc. v. Rapistan Corp.* (1989), Minn., 446 N.W.2d 372, 380, *reh'g. denied; Thomas v. Murphy* (1902), 87 Minn. 358, 91 N.W. 1097.

■ The Guzulaitises testified they relied on Homer's statements. There was evidence to support their testimony, and Minnesota law allows fraud victims to testify to the effect of the fraudfeasor's representations upon them. *Village of Burnsville v. Westwood Co.* (1971), 290 Minn. 159, 189 N.W.2d 392. The reliance must be reasonable, *Veit v. Anderson* (1988), Minn. App., 428 N.W.2d 429. The question, however, is not whether the average person would rely on the representations, but whether a person with the experience and capacity of the victim would rely. *Berg v. Xerxes–Southdale Office Building Co.* (1980), Minn., 290 N.W.2d 612; *Spiess, supra.* The Guzulaitises were not sophisticated business people. Mr. Guzulaitis has a degree in special education, and Mrs. Guzulaitis is a medical technologist. Their reliance on Homer's misrepresentations was reasonable.

■ The Homers argue the Guzulaitises waived their right to reliance by conducting the appraisal, but we are not persuaded. Homer thwarted the appraisal's effectiveness by refusing to disclose income figures to the appraiser, and the Guzulaitises' subsequent action "was not a waiver of the right to rely on [Homer's] representations." *Spiess, supra,* 41 N.W.2d at 566 (citations omitted).

The foregoing discussion illustrates the Guzulaitises set out and proved a case of fraudulent inducement under Minnesota law. In accord with *Spiess* and the other Minnesota authorities cited, and our own standard of review, we agree the trial court's judgment is clearly within the evidence and the law.

### III

■ The Homers next argue the trial court's judgment is inconsistent with Minnesota case law governing election of remedies in fraud cases. We disagree.

First, the Homers specifically argue the Guzulaitises' continued payments on the contract and their operation of the resort for several months after discovery of the

---

**2.** Homer's knowledge of the falsity of the income statements is revealed not only by the income tax records produced at trial, but by the fact that several years prior to his transactions with the Guzulaitises, Homer sold the resort to another hapless investor on the basis of falsified and inflated income figures. That purchaser had as little success as did the Guzulaitises, and Homer ultimately repossessed the resort.

fraud act as a ratification of any fraudulent acts by the Homers, thus precluding any cause of action for fraud the Guzulaitises may have had. This argument is in direct contravention to the holding of the Minnesota Supreme Court in *Rosenquist, supra. See also Berg, supra* at 616 (reaffirming the *Rosenquist* decision). The Homers' argument applies only when the fraud is discovered when the contract is wholly executory, in which case any injury from the fraud would be self-induced. *See Olson v. Northern Pacific Ry. Co.* (1914), 126 Minn. 229, 148 N.W. 67. Additionally, the Homers fail to consider the Minnesota rule that when "the property is a going business, the defrauded party is not required to abandon it in order to obtain relief." *Perkins v. Meyerton* (1934), 190 Minn. 542, 251 N.W. 559, 560.

Second, and more importantly, the Homers' arguments are largely disingenuous. The Homers rely on *Olson, supra,* for the proposition that statutory cancellation of a contract for deed terminates any cause of action a contract vendee may have had for fraud. This is a correct statement of Minnesota law, *see Hollywood Dairy, Inc. v. Timmer* (1987), Minn.App., 411 N.W.2d 258; *Gilbert Bldrs. v. Community Bank of DePere* (1987), Minn.App., 407 N.W.2d 706, *pet. for rev. denied,* but it is not well taken here. As will be remembered from our recitation of the facts, the Homers sought statutory cancellation of the deed in a Minnesota trial court. As the Homers well know, the Minnesota trial court stayed its proceedings and refused to cancel the contract pending the outcome of the present litigation. *Record* at 206–216. Because the contract has not been statutorily cancelled, *Olson* and its progeny are inapplicable.

 It is of course true that the Guzulaitises had to choose whether to keep the property and sue for damages or to seek rescission of the contract. *Anders v. Dakota Land & Development Co., Inc.* (1980), Minn., 289 N.W.2d 161. In the former

case, their measure of damages would be the difference between the purchase price and the actual value of the property purchased. *L'evesque v. Rognrud* (1958), 254 Minn. 55, 93 N.W.2d 672, 677; *Olson, supra.* In the latter case, the victim is to be placed in the status quo ante and receive a return of out of pocket damages: i.e., restitution. *Anders, supra; Spiess, supra.*

Such is the case here. The trial court ordered the Homers to return to the Guzulaitises their down payment and monthly payments, and to pay the Guzulaitises' expenses for operating the resort. There was no error.

## IV

 We come now to the issue of punitive damages. Minn.Stat. § 549.20 allows punitive damages upon clear and convincing evidence of willful indifference to the rights or safety of others. *Becker v. Alloy Hardfacing & Engineering Co.* (1987), Minn., 401 N.W.2d 655; *McGuire v. C & C Restaurant, Inc.* (1984), Minn., 346 N.W.2d 605. The trier of fact is given the exclusive task of determining the weight and force to be given to evidence relating to punitive damages. *Wilson v. City of Eagan* (1980), Minn., 297 N.W.2d 146, 150 (and cases cited therein). Misrepresentation or fraud is an independent tort which will support an award of punitive damages when coupled with an award of compensatory damages. *Cohen v. Cowles Media Co.* (1989), Minn.App., 445 N.W.2d 248, *aff'd. in part, rev'd. in part on other grounds,* 457 N.W.2d 199, *cert. granted in part* (1990), — U.S. —, 111 S.Ct. 578, 112 L.Ed.2d 583; *Maloney v. Ketter* (1987), Minn.App., 408 N.W.2d 865, *pet. for rev. denied.*[3] "The purpose of punitive damages is to both punish and deter according to the gravity of the act giving rise to a punitive damage award, but an award should not exceed the level necessary to properly punish and deter." *Melina v. Chaplin* (1982), Minn., 327 N.W.2d 19, 20, n. 1. In determining the reasonableness of

---

**3.** *But see Bucko v. First Minnesota Savings Bank* (1990), Minn.App., 452 N.W.2d 244, *pet. for rev. granted.* In *Bucko,* the court referred to the discussion in *Jacobs v. Farmland Mut. Ins. Co.*

(1985), Minn., 377 N.W.2d 441, *see infra,* n. 4, and noted the trend toward allowing punitive damages absent compensatory damages for the relief of intangible harm.

punitive damages, "the court should consider, among other factors, the degree of malice, intent of willful disregard, the type of interest invaded, the amount needed to truly deter such conduct in the future, and the cost of bringing the suit." *Wilson, supra,* at 151.

■ In the present case, there is clear evidence of fraudulent intent, coupled with losses of several thousand dollars. This will support an award of punitive damages. *See Sullivan v. Ouimet* (1985), Minn.App., 377 N.W.2d 24.[4] The amount of the award, being a question for the trial court as trier of fact, is a decision we are loath to second-guess. Suffice it to say that in this case, with Homer's repeated lies to people who relied on simple business ethics, Homer's scheme to turn a quick profit stranding his purchasers in a deal he (but not they) knew they could never complete successfully, and Homer's history of fraudulent dealings with other unsuspecting buyers, the award of $20,000 in punitive damages is neither an excessive nor an unreasonable attempt at deterrence and punishment.

## CONCLUSION

The trial court is in all things affirmed.

MILLER, P.J., and ROBERTSON, J., concur.

4. Although neither party has researched the issue of punitive damages in sufficient depth, we are aware of the Minnesota Supreme Court's decisions in *Estate of Jones v. Kvamme* (1989), 449 N.W.2d 428, and *Jacobs, supra,* n. 3 Both of these decisions hold that restoration of the status quo ante between the parties in a fraud case would not support an award of punitive damages.

A close reading of both decisions, however, persuades us our decision today is not in conflict with the Minnesota rule. In *Jacobs,* the court disallowed punitive damages in a case wherein the plaintiff received an equitable rescission of a fraudulently procured release and settlement with the defendant insurer. There were no actual or compensatory damages to support the punitive damage award, and the court required the plaintiff to abide by his choice of remedy in "this *atypical* rescission situation." *Id.* at 446 (emphasis added). The *Jones* court, relying on the *Jacobs* decision, reversed a punitive damages award in a case of a fraudulently induced stock transfer in a close corporation which led to a large amount of unjust enrichment. The trial court, however, had imposed a constructive trust on the fraudfeasor requiring a return of the fruits of his misrepresentation. The supreme court found the rescissionary damages and the constructive trust were a sufficient remedy. *Jones, supra,* at 432.

Here we are presented with an archetypal rescission situation, wherein the punitive damages are supported by an award of out-of pocket damages, and the *Jacobs* and *Jones* limitations on punitive damage awards are inapplicable.

1. This case was reassigned to this office on January 2, 1991.