**BIOMET, INC., Plaintiff/Counter–Defendant,**

v.

**Wayne T. SMITH Defendant/Counter–Plaintiff.**

**Cause No. 3:01CV0753 AS.**

United States District Court,
N.D. Indiana,
South Bend Division.

Dec. 23, 2002.

Harold Roderic Heard, Elizabeth M Keiley, Wildman Harrold Allen and Dixon, Chicago, IL, Daniel P Hann, Warsaw, IN, for Plaintiff/Counter–Defendant.

Edward W Harris, III, Sommer Barnard and Ackerson PC, Indianapolis, IN, Mitchell A Kramer, Barbara Kramer, Kramer & Kramer LLP, Rydal, PA, for Defendant/Counter–Plaintiff.

### MEMORANDUM AND ORDER

ALLEN SHARP, Judge.

This cause is before the Court on Biomet's Motion for Summary Judgment filed on September 3, 2002, and Biomet's Motion to Strike filed on October 15, 2002. The case arises out the circumstances surrounding Biomet's termination of Wayne Smith as its sole distributor for a sales region in Texas. The parties have briefed the issues and filed the appropriate responses and replies, and the Motions are ripe for ruling. The Court has considered the submissions of the parties and the voluminous record in this case and now rules as follows.

### I. JURISDICTION

Jurisdiction is premised upon complete diversity of citizenship pursuant to 28 U.S.C. § 1332(a), and an amount in controversy in excess of $75,000.00.

### II. RELEVANT FACTS

Biomet is a manufacturer of orthopedic implants and related instrumentation. Biomet's Mem. in Supp. at 2. Biomet distributes its products through a network of authorized, independent sales representatives. *Id.* The Defendant, Counter–Plaintiff, Wayne Smith, was a distributor for Kirschner Medical Corporation, a medical products company in South Texas, beginning in 1988. Biomet's Mem. in Supp. at 2; Smith's Mem. in Opp. at 2. Kirschner Medical Corporation was acquired by Biomet in 1994. *Id.* As a distributor for Kirschner, Smith had a sales staff and an existing client base in South Texas. *Id.*

After Biomet acquired Kirschner, it entered into an agreement with Smith under which he would be the sales representative for Biomet products covering the same territory. *Id.* This agreement was memorialized in a letter dated October 14, 1994 (the letter agreement). Smith's Answer, Ex. 1. The letter stated, "It is agreed and understood that either of us may terminate this relationship, with or without cause, by giving the other thirty (30) days' written notice of such termination." *Id.,* at page 2. Other relevant portions of the agreement state that as a distributor for Biomet, Smith was expected "to operate in accordance with all Biomet distributor policies and procedures," (Ex. 1 at ¶ a); "to maintain a competent and aggressive salesforce to market and sell Biomet Products," (*Id.* at ¶ b); to equal or exceed the sales quotas and percentage increases established by Biomet for his territory every year, (*Id.* at ¶ c); to devote his full business time, attention and best efforts in marketing, promoting and selling Biomet Products; and not to engage in any business that competes directly or indirectly with the sale of Biomet Products, (*Id.* at ¶ d).

The agreement contained a covenant not to compete, but it only applied in the event that Smith terminated the relationship. *Id.* at 2–3. The agreement also stated that "in the event of any dispute between us,

the laws of the State of Indiana shall govern the validity, performance, interpretation, enforcement and any other aspect of our agreement or relationship." *Id.*, at 3.

In order to market and sell Biomet's products in the territory, Smith contracted with three sales associates. Smith's Mem. in Opp. at 2. Sales agents are often present during surgical procedures when their products are being used to ensure that all necessary supplies and instrumentation are available and to provide technical assistance to the surgeons. *Id.* Therefore, success in marketing Biomet's products requires that the sales agents have medical knowledge and technical expertise, as well as the ability to develop strong working relationships with doctors and hospital personnel. *Id.*

In addition, Biomet distributors are required to purchase and maintain the instruments used by surgeons to implant Biomet devices. *Id.* at 20. Smith purchased in excess of four hundred thousand dollars ($400,000.00) worth of instruments with a retail value of in excess of one million dollars ($1,000,000.00). In 1997, Biomet issued a new Biomet Distributor Policy Manual which states that Biomet is under no obligation to repurchase instrumentation from retiring or terminated distributors.

On April 21, 2001, the parties amended the letter agreement to include an additional county in Smith's territory. *Id.*, at 6. Then, on July 10, 2001, Biomet's Southwest Area Vice President, Terry Geurink, informed Smith that Biomet was terminating its business relationship with him as of July 10, 2001. A letter was hand delivered to Smith the same day to confirm the termination. Smith's Ans., Ex. 2. The letter stated that Biomet would continue to pay Smith commissions on all orders

placed with Biomet for the next thirty days, but that he was relieved of all responsibilities effective immediately. *Id.* The reason given for the termination was the fact that Smith failed to achieve a satisfactory level of sales growth when compared to Biomet's domestic sales growth, and includes a chart comparing Smith's sales growth with Biomet's. *Id.* at page 2.

Before informing Smith that he was being terminated, Biomet made arrangements to have two sales representatives take over his territory. *Id.* at 3. Within hours after delivering the termination letter to Smith, a representative from Biomet called Smith's sales agents to inform them that Smith was terminated and to ask them to continue selling Biomet products. *Id.* Two of Smith's sales agents agreed to work with the new distributors and continue selling Biomet products, effective immediately. These two agents and their clients accounted for a substantial portion of Smith's business, according to figures provided by Biomet. Biomet's Mem. in Supp. at 2 and 5. A single doctor, Dr. Bassett, represented nearly 65% of Smith's business, and he agreed to continue using Biomet products.[1] *Id.*

After receiving the termination letter, Smith was able to contact one of his agents, Anna Rose Arsenian, before Biomet contacted her. Smith Mem. in Opp. at 24. She declined to become a Biomet sales agent, and the doctor she represented said he was no longer interested in using Biomet products. *Id.* at 6. Biomet claims that their representatives did not speak with this agent at all, but Smith has provided deposition testimony from Geurink and an Affidavit from the sales agent stating that Geurink and another Biomet representa-

---

1. In his deposition testimony, Dr. Basset stated that he had designed the product he purchased from Biomet, and that he would continue to purchase it because he believed it to be the best available.

tive met with her and asked her to continue representing Biomet. *See,* Biomet Mem. in Supp. at 6; *but see,* Geurink Deposition at p. 56, lines 20–24; Arsenian Aff. Smith's Ex. 22. Smith had written contracts with two of his three agents requiring them to give thirty day notice to Smith to terminate the agreements. *Id.* One of the agents that quit immediately to work for Biomet's new distributors was under contract with Smith. *Id.*

Biomet claims that several times in 2000, its area vice president, Geurink, spoke with Smith about the need to grow his business. Biomet's Mem. in Supp. at 4. In Spring of 2001, Biomet says that it approached Smith with an offer to restructure the business by bringing in a new distributor with Smith working as a sales agent under the new distributor for a guaranteed six figure income. *Id.* Biomet offered Smith $430,000 as "transition assistance" and proposed that Smith transfer title to his instruments to Biomet. *Id.* Smith rejected this offer, claiming that his distributorship was worth two to three million, and that he refused to take less than two million. *Id.*

After his termination, Smith requested that Biomet perform the final inventory of Biomet products in his possession on July 10, 2001, the same day as his termination, to avoid any discrepancies in the inventory. Smith's Mem. in Opp., Ex. 18. Biomet did not perform the final audit until July 13, 2001, and found products missing. Biomet's Mem. in Supp. at 6. As a result, Biomet deducted $13,906.00 from Smith's final commission check in accordance with Biomet's Policy Manual. *Id.* Smith was not aware of the shortfall until August 20, 2001, and claims that the missing products were used for surgeries in his former territory that took place between July 10 and the July 13 inventory. Smith Mem. in Opp. at 22. Biomet's regional vice president, Geurank, testified that he was not informed of the inventory shortfall, and that no one asked him to check with hospitals or attempt to locate the missing inventory before the cost was deducted from Smith's commission check. *Id.,* and Ex. 4, pp. 92–93.

After Smith's termination, the parties engaged in negotiations to resolve the problems surrounding the termination, but were unable to resolve anything. Smith's Mem. in Opp. at 4. Around August 7, 2001, Smith had a conversation with Biomet employee Peter Rockwood in which Smith allegedly said that if his lawyer was not able to get Smith what he wanted from Biomet, he just might have to take a weapon to Warsaw [Biomet's headquarters] and settle it himself. Rockwood Aff., also Rockwood Dep. at pp. 9 and 10. Mr. Rockwood said he was not able to quote Smith exactly, but was certain that Smith had said something like that it would be a possibility for him to go to Warsaw with a gun if he didn't get what he wanted. *Id.* Smith denies making this statement. Smith Mem. in Opp. at 5.

About September 18, 2002, Smith called Biomet headquarters and asked about the procedures he would need to undertake in order to speak or be recognized at the annual shareholders' meeting, scheduled for September 29, 2001. Sasso Aff., Biomet's Ex. N. About the same time, Biomet claims that it first learned about the alleged threat made by Smith. Biomet's Mem. in Supp. at 8. In addition, Biomet learned that Smith had sent letters to some of Biomet's distributors informing them that he planned to attend the annual shareholders' meeting and asking them to let him know if they "have any issue." Hahn Aff., Biomet's Ex. M. Also, around August 1, 2001, before his termination, Smith sent a postcard to Dr. Dane Miller, Biomet's Chief Executive Officer, stating, "I need a vacation. Hope all is going well

at Biomet. Best Regards, Wayne T. Smith."

With this information, Biomet went to the Kosciusko County Superior Court and on September 26, 2001, got a protective order preventing Smith from attending the annual shareholders' meeting or having any contact with any employee, director, shareholder, sales person or agent of Biomet. Biomet's Mot., Ex. P. The Petition states "Respondent has stated that if he does not get what he wants from Biomet, he will take a firearm to Warsaw, Indiana and settle it himself. Petitioner has reason to believe that Respondent plans to attend Biomet's Annual Meeting in Warsaw on September 29, 2001." *Id.* The Petition is supported by Affidavits from Hahn, Sasso, and Rockwood. This Protective Order effectively prevented Smith from attending the shareholders' meeting.

About this time, Smith's former client, Dr. Bassett, learned about the alleged threat and the Protective Order. Smith's Mem. in Opp. at 6–7. Dr. Bassett testified that Biomet distributor LaGrange informed him that Smith "still owned stock in the Biomet company and that he could go to the annual stockholders meeting and that he was going to go there with a pistol and settle it." *Id.* at 7, Bassett Dep. Rockwood also discussed the incident with another Biomet employee, Cliff Porterfield. *Id.* at 8. Porterfield testified that Rockwood did not seem to take Smith's statement seriously. Smith's Mem. in Opp., Ex. 12. On October 23, 2001, Smith had the case removed to federal court, and on November 28, 2001, he filed an Answer to Biomet's petition for a protective order which included six counterclaims, for defamation, abuse of process, two counts of breach of contract, a count for violation of the Texas Sales Representative Act, and a count for tortious interference with prospective business advantage.

### III. STANDARD OF REVIEW

Biomet has filed two motions with this Court, a Motion to Strike portions of the Declaration of Wayne Smith and the deposition testimony of Cliff Porterfield, and a Motion for Summary Judgment on all six counts of Smith's Counterclaim. The testimony Biomet wants to strike was filed in support of Smith's Memorandum in Opposition to Biomet's Motion for Summary Judgment. Therefore, the testimony is only subject to the general requirements found in Rule 56 of the Federal Rules of Civil Procedure for admissible testimony in support of or opposition to a motion for summary judgment.

As to Biomet's Motion for Summary Judgment, the standard a court employs in reviewing that motion is now well-established. Summary judgment is proper only if the record shows that there is no issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). To determine whether a genuine issue of material fact exists, the court must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. *King v. Preferred Technical Group,* 166 F.3d 887, 890 (7th Cir.1999)(citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

The initial burden is on the moving party to demonstrate, "with or without supporting affidavits," the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in the moving party's favor. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)(quoting Fed.R.Civ.P. 56). Once the moving party has met the initial burden, the opposing party must "go beyond the pleadings" and "designate 'specific

facts showing that there is a genuine [material] issue for trial.'" *Id.* "Factual disputes are 'material' only when they 'might affect the outcome of the suit under the governing law.'" *Oest v. Illinois Dep't of Corrections,* 240 F.3d 605, 610 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The nonmoving party cannot rest on its pleadings, *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 920–21 (7th Cir.1994); *Hughes v. Joliet Correctional Ctr.,* 931 F.2d 425, 428 (7th Cir.1991), nor may that party rely upon conclusory allegations in affidavits. *Cusson–Cobb v. O'Lessker,* 953 F.2d 1079, 1081 (7th Cir.1992).

Summary judgment is not a disfavored procedural shortcut, but rather is intended to avoid a useless trial, and is appropriate where it is quite clear what the truth is. *Babrocky v. Jewel Food Co. & Retail Meatcutters,* 773 F.2d 857, 861 (7th Cir. 1985). On a motion for summary judgment, the Court must not weigh conflicting evidence, but rather determine whether the non-moving party has presented sufficient evidence for a reasonable factfinder to decide in his favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Only if no reasonable jury could find for Smith should Biomet's Motion for Summary Judgment be granted. *Hostetler v. Quality Dining,* 218 F.3d 798, 806 (7th Cir.2000) (citations omitted). Applying the above standards, this Court addresses Biomet's two motions.

### IV. ANALYSIS

The parties have raised several issues which must be addressed before getting to the merits of Biomet's Motion for Summary Judgment. The first issue is whether to apply the laws of the State of Indiana or Texas. The second issue, raised in Biomet's Motion to Strike, is whether Smith's supporting affidavits meet the standard for admissibility as set forth in Rule 56. The Court will consider each of these issues in turn before discussing whether Biomet is entitled to summary judgment on all of Smith's claims as a matter of law.

### A. Choice of Law

■ Federal courts sitting in diversity must look to the conflict-of-laws rules of the forum state to determine the applicable substantive law. *Jupiter Aluminum Corp. v. Home Insurance Co.,* 225 F.3d 868, 873 (7th Cir.2000), citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *West Suburban Bank of Darien v. Badger Mutual Insurance Co.,* 141 F.3d 720, 724 (7th Cir.1998). The forum state in this case is Indiana; therefore, Indiana's conflict-of-laws rules apply.

Indiana choice of law doctrine favors contractual stipulations as to governing law. *Hoehn v. Hoehn,* 716 N.E.2d 479, 484 (Ind.Ct.App.1999); *Homer v. Guzulaitis,* 567 N.E.2d 153, 156 (Ind.Ct.App.1991), trans. denied; *Barrow v. ATCO Mfg. Co.,* 524 N.E.2d 1313, 1315 (Ind.Ct.App.1988). In this case, the contract had a broad choice-of-law provision that governed "the validity, performance, interpretation, enforcement and any other aspect of our agreement or relationship." Def.'s Ex. 2, page 3. Even Smith's tort claims—defamation and tortious interference with prospective business advantage—are covered by this language, as they relate to an aspect of the relationship between Smith and Biomet.

Smith claims that Texas law governs his tort claims, based on a recent opinion by the Indiana Supreme Court in *Allen v. Great American Reserve Ins. Co.,* 766 N.E.2d 1157, 1164–70 (Ind.2002). However, a close examination of *Allen* does not support Smith's claim. In *Allen,* the plaintiffs were insurance agents in North and

South Carolina, and the defendants were the insurance company, and the company's agent for the region. *Id.* The plaintiffs' relationship with the company was covered by a contract that required the use of Indiana law, and the Court used Indiana law to rule on the plaintiffs' claims as to this defendant. The plaintiffs' relationship with the agent was not governed by a contract, therefore, the Court used Indiana's choice-of-law rules and determined that Indiana law did not apply.

Likewise, in another case cited by Smith from this Court, *Ram Products Co., Inc. v. Chauncey,* 967 F.Supp. 1071 (N.D.Ind. 1997), the parties relationship was not governed by a contract. Given the broad and unambiguous contractual language in this case, and the fact that Smith was a sophisticated businessman at the time he signed the contract, the Court sees no reason not to enforce the choice-of-law provision as agreed to by the parties. Therefore, Indiana law will be applied to all the plaintiff's claims, not just the ones that are contractual in nature.

## B. The Motion to Strike

■ Rule 56(e) states that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. Rule Civ. P. Rule 56(e). In addition, Rule 56(e) states that the affidavits may be "supplemented or opposed by depositions, answers to interrogatories, or further affidavits." *Id.* Biomet has asked the Court to strike Paragraph 9 of the Declaration of Wayne Smith, claiming that it contradicts his sworn deposition testimony. In addition, Biomet has asked the court to strike the deposition testimony of Cliff Porterfield as inadmissible hearsay.

In paragraph 9 of his declaration, Smith states, "Biomet advised me that Biomet's practice had been to repurchase instrumentation from distributors at the end of their distributorships. Biomet informed me that it would repurchase my instrumentation." Smith's Mem. in Opp., Ex. 17. Biomet claims that these statements are mere conclusions unsupported by any facts. Biomet's Mot. to Strike at ¶ 5. In addition, Biomet claims that these statements contradict his deposition testimony that he understood that Biomet's Distributor Policy Manual expressly disclaimed any obligation to repurchase instruments. *Id.* at ¶¶ 6–7.

Smith claims that Biomet is misreading his deposition testimony, in which he admits that the 1997 Distributor Policy Manual expressly disclaims any obligation to repurchase instruments because he has consistently asserted that the 1997 modification to the Manual does not alter the 1994 letter agreement that governed his relationship with Biomet. Smith's Mem. in Opp. at 2. Smith points out that the language Biomet relies on was not in the letter agreement, nor was it in a Biomet Manual at the time he entered into the agreement in 1994. *Id.* This language did not become a part of the Manual until 1997, and he claims it is for a jury to decide whether Biomet successfully amended the contract unilaterally by including a statement in the 1997 Manual that was not supported by any consideration. *Id.* The Court concludes that the admission in Smith's deposition testimony does not contradict his claim that he was told that Biomet would repurchase his instruments.

Biomet also claims that Smith's statements are conclusions and not supported by any facts, and therefore should be stricken. Smith asserts that when he initially entered into the distributorship rela-

tionship with Biomet, and again at the time of his termination, someone from Biomet assured him that Biomet wanted and would repurchase his instrumentation. A conclusory statement is one that expresses "a factual inference without stating the underlying facts on which the inference is based." BLACKS LAW DICTIONARY 284 (7th ed.1999). A conclusion is "a judgment arrived at by reasoning; an inferential statement." *Id.* In this case, Smith is not drawing a conclusion, for example, that he always assumed that Biomet would repurchase his instruments; rather, he is stating a fact, that in his negotiations with Biomet, someone representing Biomet assured him that Biomet would repurchase his instruments. Biomet can deny that fact, but it is for a jury to decide who is telling the truth. Taking the facts in the light most favorable to Smith, as the Court must do at this stage in the litigation, the Court can find no basis for striking paragraph 9 of Smith's declaration, therefore, Biomet's Motion on this issue is **DENIED.**

■ Biomet has also asked the Court to strike the deposition testimony of Cliff Porterfield. Porterfield testified to a conversation that he had with Peter Rockwood, the Biomet distributor who allegedly heard Smith make the remark about taking a gun to Warsaw. Porterfield testified that he did not think that Rockwood took Smith's statement seriously. Biomet objects to this statement because any statement made by Rockwood as reported by Porterfield is hearsay, and Biomet asserts that no objection to the hearsay rules allow for it to be admitted.

Smith claims that Porterfield's testimony is not hearsay. Smith is not using Porterfield's testimony to determine what Rockwood did or did not *say,* but rather as evidence as to Rockwood's reaction to Smith's statements. As such, Porterfield can testify about things like Rockwood's facial expression when he conveyed the statements, whether he laughed or seemed to think it was all a joke, or on the other hand, whether Rockwood seemed disturbed by the incident and was wondering what he should do. This appears to be a legitimate use of Porterfield's testimony, based upon his personal observation of Rockwood's demeanor, and the Court agrees that Porterfield is not repeating Rockwood's statements for the truth of the matter asserted. Porterfield was not testifying as to Rockwood's state of mind, so Federal Rule of Evidence 803(3) does not apply, but Porterfield's evidence is not hearsay, making it is unnecessary to find an exception to the hearsay rule.[2] Therefore, Biomet's Motion to Strike Mr. Porterfield's deposition testimony is also **DENIED.**

## C. Smith's Six Claims against Biomet

Biomet has asked for summary judgment on all six claims that Smith brought in his Answer and Counterclaims against Biomet. Smith's six counterclaims are for (1) defamation, (2) abuse of process, (3) breach of contract for not giving him thirty days notice, (4) breach of contract for not repurchasing his instrumentation, (5) violation of the Texas Sales Representative Act for not paying him all commissions due, and (6) interference with prospective economic advantage. The Court will address Biomet's Motion as to each of these claims separately in the order presented in the Counterclaims.

---

**2.** Neither party raised the issue of whether statements made by Rockwood, as an agent of Biomet, can be attributed to Biomet for purposes of this litigation. If so, Porterfield could testify as to what Rockwood said for the truth of the matter asserted, and the statements would be admissible under Rule 801(d)(2) as an admission of a party opponent.

### 1. Claim One: Defamation

Biomet states in its Memorandum in Support that the elements for establishing a claim for defamation in Indiana are publication of a statement with defamatory imputation, malice, and damages. Biomet's Mem. in Supp. at 11, citing *Schrader v. Eli Lilly & Co.*, 639 N.E.2d 258 (Ind.1994). That same argument was made recently to an Indiana Appellate Court, which stated that given the four separate opinions in the Indiana Supreme Court's most recent decision addressing defamation, "it is not clear that actual malice is the standard of fault where the plaintiff is a private figure *and the matter is not a public or general concern.*" *Gatto v. St. Richard School, Inc.*, 774 N.E.2d 914, 922 (Ind.Ct.App.2002) (emphasis in the original), citing *Journal-Gazette Co. v. Bandido's, Inc.*, 712 N.E.2d 446 (Ind.1999). Nevertheless, the Court in *Gatto* declined to decide the issue because it was not necessary to the outcome of the case. *Id.*, at 922–3.

No one has suggested in this case that Mr. Smith is a public figure, or that his statement was a matter of public or general concern. Given the uncertainty of the law on the issue of malice in Indiana for private figures and matters that are not of public or general concern, this Court will not include malice as an element of the claim. Therefore, Smith need only establish a defamatory statement that was published and damages.

■ "A statement is defamatory if it tends to harm the reputation of another so as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Id.* at 923, citing *Van Eaton v. Fink*, 697 N.E.2d 490, 494 (Ind.Ct.App.1998). A communication is considered defamatory *per se* if it imputes: (1) criminal conduct; (2) a loathsome disease; (3) misconduct in a person's profession or occupation; or (4) sexual misconduct. *Branham v. Celadon Trucking Services, Inc.*, 744 N.E.2d 514 (Ind. App.2001). Initially, the question whether a communication is defamatory is a matter of law for the court; it is only presented to the jury as a question of fact if the communication is reasonably susceptible to different interpretations, both defamatory and non-defamatory. *Id.*

In this case, Smith claims that Biomet made a defamatory statement about him when it claimed that he said that, if his lawyer could not get him what he wanted, he was going to take a gun to Biomet's annual shareholders' meeting and settle matters himself. He has provided evidence that in addition to passing Smith's alleged statement up and down the chain of command within Biomet, a Biomet representative also leaked the statement to a former client of Smith's, Dr. Bassett. Eventually, this information was disseminated to most of his clients along with the fact that Biomet had gotten a protective order to keep Smith from going to the shareholders' meeting. Smith claims that as a result, most of his former clients no longer do business with him. Biomet's Ex. R, Smith's Answers to Interrogatories. Smith also says that other orthopedic device manufacturers have heard about his alleged statements and the protective order, and will not do business with him either. *Id.*

■ Based on this information, the Court concludes as a matter of law that Biomet's communication about Wayne Smith, that Smith said he was going to go to Biomet's annual shareholders' meeting and settle matters with a gun, was defamatory. It imputed criminal conduct, alleged misconduct in connection with Smith's profession and occupation, harmed his reputation in the community and deterred others from doing business with him. In addition, Smith has provided evidence that Biomet published the statement when a

Biomet agent repeated it to Dr. Bassett, who then felt obligated to inform others in Smith's circle of business associates about Smith's alleged statement. Finally, Smith submitted evidence that he suffered damages because of the communication. Therefore, the Court concludes that Smith has produced enough evidence that a reasonable jury could find in his favor on each of the elements on his defamation claim, enabling him to survive summary judgment.

■ However, Biomet has raised a number of defenses to Smith's claim of defamation. First, as Biomet correctly points out, truth is a complete defense to a claim of defamation in Indiana. *See, Gatto,* 774 N.E.2d at 924. In addition, Biomet claims that its communication of Smith's statement is privileged because statements contained in judicial proceedings are absolutely privileged if they are pertinent and relevant to the litigation. *Van Eaton v. Fink,* 697 N.E.2d 490 (Ind.Ct.App.1998), citing *Chrysler Motors Corp. v. Graham,* 631 N.E.2d 7, 9 (Ind.Ct.App.1994), *trans. denied.* Absolute privilege provides judges, attorneys, parties and witnesses, in connection with a judicial proceeding, immunity from liability even if they publish defamatory material with an improper motive. *Id.* at 494 (citations omitted). Whether a privilege applies is a question of law for the court to decide. *See, Kitco, Inc. v. Corporation for General Trade,* 706 N.E.2d 581 (Ind.Ct.App.1999).

In this case, Biomet made statements in judicial pleadings for the purpose of getting a protective order. Therefore, the statements were covered by an absolute privilege when Biomet included them in its petition. Even if the Smith succeeded in establishing that the statements were totally false, they would still be covered by the privilege. However, the statement was not covered by the same privilege when it was conveyed to Dr. Bassett, be-cause it was outside the judicial proceeding. Also, it appears from his testimony that Dr. Bassett was told that "Wayne was very upset and that he still owned stock in the Biomet company and that he could go to the annual stockholders' meeting and that he was going to go there with a pistol and settle it." Bassett Dep. at pp. 14–5, Smith Ex. 7. Dr. Bassett testified that he received this communication from La-Grange, a Biomet agent, and that he was told the information came from Rockwood.

The statement as reported to Dr. Bassett is materially different from the statement Rockwood claims to have heard from Smith, and which was included in the petition for the protective order. The protective order states: "Respondent has stated that if he does not get what he wants from Biomet, he will take a firearm to Warsaw, Indiana and settle it himself. Petitioner has reason to believe that Respondent plans to attend Biomet's Annual Meeting in Warsaw on September 29, 2001." The first statement was based on Biomet's understanding of Smith's alleged statement of August 7, 2001, as reported by Peter Rockwood. The second statement was based on a phone call Smith made to Biomet's corporate offices on September 18, 2001. The statement does not include dates or the amount of time that passed between the first and the second incident, making it appear that the two are connected. However, the petition does not say that Smith threatened to take a pistol to Biomet's annual shareholder meeting and settle matters himself, and that is what Dr. Bassett testified that he was told by La-Grange.

Based on the evidence presented, the Court concludes that a material alteration was made to Smith's alleged statement somewhere between Biomet's protective order and the communication between La-Grange and Dr. Bassett. This change con-

cerns the Court, and is sufficient for the Court to conclude that Biomet made a defamatory statement to Dr. Bassett through its agent, that the statement was not entirely true, and that it was not protected by the judicial privilege.

▇ The other privilege that Biomet asserts is the privilege for a common interest. It is a qualified privilege that applies to communications "made in good faith on any subject matter in which the party making the communication has an interest or in reference to which he has a duty, either public or private, either legal, moral, or social, if made to a person having a corresponding interest or duty". *Gatto*, 774 N.E.2d at 924–5, *citing, Schrader v. Eli Lilly & Co.*, 639 N.E.2d 258, 262 (Ind. 1994). The privilege arises out of the necessity for full and unrestricted communication on matters in which the parties have a common interest. *Id.* (citations omitted).

▇ Indiana courts have applied this privilege to communications between employers and employees, business partners, members of fraternal organizations, creditors and credit agencies, and between a school and its parents. *Id.* It is a qualified privilege and may be lost if abused, as when: (1) the communicator was motivated primarily by ill will; (2) there was excessive publication of the defamatory statements; or (3) the statement was made without belief or grounds for belief in its truth. *Id.*

Biomet discussed in its briefs how this privilege applied to its communication of Smith's statement within the corporation, but it did not explain how this privilege applied to Dr. Bassett. The relationship between Biomet and Dr. Bassett does not fit within any of the exceptions already recognized by the State of Indiana. By this time, Smith no longer worked for Biomet as a distributor, and he no longer had a business relationship with Dr. Bassett. Smith had in no way threatened Dr.

Bassett or anyone else in Texas, if he had threatened anyone. The Court is hard pressed to find a reason why Biomet needed to relay this information to Dr. Bassett. Therefore, the Court holds that communication of Smith's alleged statement to Dr. Bassett was not covered by the privilege of common interest.

In conclusion, Biomet's communication to Dr. Bassett regarding Smith and his alleged statement was defamatory, and it was not covered by the judicial privilege or by the common interest privilege. Biomet's motion on this issue is therefore **DENIED**. It is for a jury to decide if the defamatory statement was published, and if Smith suffered damages as a result.

### 2. Claim Two: Abuse of Process

▇ Smith claims that Biomet committed the common law tort of abuse of process by filing a petition for a protective order with an ulterior motive, to assert false and malicious allegations against Smith and to damage his reputation. In Indiana, to state a claim for abuse of process, Smith must prove:1) an ulterior purpose; and 2) a willful act in the use of process not proper in the regular conduct of the proceeding. *Reichhart v. City of New Haven*, 674 N.E.2d 27 (Ind.App.1996). "Otherwise stated, abuse of process requires a finding of misuse or misapplication of process, for an end other than that which it was designed to accomplish." *Id.* (citations an internal quotation marks omitted).

▇ In *Reichhart*, the Court considered whether it could affirm a trial court's holding denying summary judgment on an abuse of process claim because genuine issues of material fact existed with regard to the plaintiff's motives in instituting and prosecuting the lawsuit. *Id.* The Court concluded that despite language from some cases that could be read to support

the trial court's ruling, an abuse of process claim has two distinct elements, and a party must first establish that the defendant employed improper "process" before the court proceeds to an examination of the defendant's motives. *Id., citing Comfax Corp. v. North American Van Lines, Inc.,* 638 N.E.2d 476, 485 (Ind.Ct.App. 1994), and *Groen v. Elkins,* 551 N.E.2d 876, 878–79 (Ind.Ct.App.1990). The Court noted that the term "process" in this context is the use of "judicial machinery", and the relevant inquiry is whether the complained-of acts were "procedurally and substantively proper under the circumstances." *Id.* at 32, citing *Groen,* 551 N.E.2d at 879. As an alternative, the court may ask whether the use of process "was a legitimate use of the judicial system." *Id.* (citations omitted).

In this case, Biomet sought a protective order for the purpose of preventing Smith from attending the shareholder's meeting, allegedly out of concern for the safety of those present. This is a legitimate use of the judicial system, regardless of Biomet's motive, and Biomet's petition was "legitimate and proper under the circumstances." "There is no liability where the defendant has done nothing more than carry out process to its authorized conclusion, even with bad intentions." *Id.,* quoting, *Groen,* 551 N.E.2d at 878–9. Therefore, Biomet's Motion for Summary Judgment on this issue must be **GRANTED.**

### 3. Claim Three: Breach of Contract based on wrongful termination

█ Smith claims that Biomet breached the letter agreement by failing to give him the required thirty day notice before removing him from the distributorship position. Biomet claims that if there was a breach, it was not material because they continued to pay Smith commissions on all sales within his territory for the next thirty days, so there was no loss of income. However, Smith points out that he was entitled to continue selling in the territory for thirty more days, and that depriving him of that right under the agreement allowed Biomet to contact his customers before he could explain to them what was happening. Biomet counters this argument with the that Smith could not solicit his customers to change to a new product during the thirty day period because that would violate the contractual provision that required Smith to devote his full business time, attention and best efforts to selling Biomet products, and that he would not engage in any business that competes with Biomet products.

Under Indiana contract law, the construction of an unambiguous contract is a question of law for the court to decide. *Allen,* 236 F.3d at 380, *citing Bicknell Minerals, Inc. v. Tilly,* 570 N.E.2d 1307, 1311 (Ind.Ct.App.1991). If the meaning of the contract is ambiguous or uncertain, then the court is allowed to entertain extrinsic evidence to determine its meaning, and its construction is an issue of fact. *Id.* The contract provision unambiguously requires Biomet to give Smith thirty days written notice before termination. The Court finds that Biomet did, in fact, breach the contract by not giving Smith the required thirty days notice before his termination. The question then becomes whether the breach was material.

The question of whether a party has materially breached an agreement is a question of fact and is dependent upon several factors including:

(a) The extent to which the injured party will obtain the substantial benefit which he could have reasonably anticipated;

(b) The extent to which the injured party may be adequately compensated in damages for lack of complete performance;

(c) The extent to which the party failing to perform has already partly performed or made preparations for performance;

(d) The greater or less hardship on the party failing to perform in terminating the contract;

(e) The willful, negligent or innocent behavior of the party failing to perform;

(f) The greater or less uncertainty that the party failing to perform will perform the remainder of the contract.

*Tomahawk Village Apartments v. Farren,* 571 N.E.2d 1286, 1292 (Ind.Ct.App.1991), *quoting, Churchwell v. Coller and Stoner Bldg. Co.,* 179 Ind.App. 357, 385 N.E.2d 492, 495 (1979).

Biomet cites the decision in *Titus v. Rheitone, Inc.,* to support its claim that failure to allow Smith to continue working for thirty days after his termination was not a material breach of the contract. 758 N.E.2d 85 (Ind.App.2001). In *Titus,* a former employer brought a lawsuit to enforce a covenant not to compete against a former employee. *Titus,* 758 N.E.2d at 94. The former employee raised as a defense the fact that she was not allowed to continue working for the thirty days after she was given notice, claiming that her employer breached the contract first, allowing her to breach the covenant not to compete. *Id.* The Court disagreed, finding that because the employee was paid her salary for the thirty days, and half of her bonus for two months, the decision not to allow her to continue working the additional thirty days did not constitute a material breach. *Id.*

In this case, Smith was told that he was being terminated effective immediately, but that he would be paid all commissions for his territory for the next thirty days. Running the analysis to determine if this is a material breach of the agreement, the Court finds on (a), that Smith received the substantial benefit for which he bargained, all commissions from his territory for the next thirty days, but he did not have the opportunity to put "all of his ducks in a row", as he suggests, but overall, this factor weighs slightly in favor of Biomet. On (b), Smith has been paid his commissions, but he alleges that the early termination caused him additional damages. The fact that his commissions were reduced for allegedly missing product is not a result of the lack of notice, and must be brought as a separate claim. But Smith also claims that as a result of the breach, Biomet was able to put new sales agents in his territory and destroy the value of his business. The Court concludes that this factor weighs slightly in favor of Smith.

On (c), Biomet had substantially performed under the agreement for many years, and only as negotiations proved fruitless did Biomet determine to terminate Smith, pull him from his position immediately and pay him all he would have earned had he continued working for the additional thirty days. The Court concludes that Biomet substantially performed under the agreement, and that, this factor also weighs in favor of Biomet.

Factor (d) requires weighing the hardship to the party failing to perform if the contract is terminated. In this case, the contract is already terminated, and no continued performance is wanted or necessary. Therefore, there is no hardship on Biomet in terminating the contract. As to whether Biomet's conduct was willful, negligent or innocent, it would appear to have been a deliberate decision, so factor (e) weighs in favor of Smith. But again, on (f), the contract is fully performed and terminated, leaving no uncertainty that Biomet will perform under the remainder of the contract.

In summary, factors (a), (c), (d), and (f) weigh in favor of finding that the breach was not material. Only factors (b) and (e) weigh in favor of finding that the failure to

give notice was material. This is consistent with the cases like *Titus* that have found that failure to give notice, where the employee was fully paid for the notice period, was not a material breach of the employment contract. The Court concludes, therefore, that Biomet's failure to allow Smith to continue working for the last thirty days, without more, was not a material breach of the letter agreement. Biomet's Motion for Summary Judgment on Claim Three is **GRANTED.**

### 4. Claim Four: Breach of Contract based on failure to repurchase the instruments

 Smith also claims that Biomet breached the letter agreement by failing to repurchase his instruments. Biomet counters that they were not obligated to repurchase the instruments because the 1997 Distributor Policy Manual states specifically that Biomet is under no obligation to repurchase instrumentation from retiring or terminated distributors, and that Smith had agreed in the letter agreement to operate in accordance with all Biomet distributor policies and procedures. Biomet points out that Smith testified in his deposition that he was familiar with this provision of the Manual, and interprets this testimony as evidence that Smith knew that Biomet was not obligated to repurchase his instruments. In addition, Biomet argues that it made several offers to purchase Smith's instruments, which Smith rejected, and that somehow this supports its position that is was not obligated to repurchase the instruments. Smith, however, points to this same evidence as tending to establish that Biomet knew it had an obligation to repurchase the instruments, but that the parties were unable to agree on a price.

At the heart of this dispute is Smith's allegation that when he agreed to become a Biomet distributor, he was assured by more than one Biomet agent that Biomet always repurchased instruments from its distributors. The initial letter agreement is silent as to the repurchase of instruments, and Smith argues that Biomet cannot unilaterally amend the agreement by adding language to its Distributors Manual. Therefore, Smith is arguing that while the letter agreement is not ambiguous on its face, an ambiguity is created by its silence on the repurchase of instruments that can only be resolved with extrinsic evidence.

Two issues of fact stand out on this question that must be resolved by a jury. The first is how to interpret the silence in the letter agreement as to what was to happen to in excess of $400,000 in instrumentation. Smith claims that it was the practice at the time for Biomet to repurchase the instruments, making is unnecessary to include it in the agreement. A reasonable jury could believe Smith, making summary judgment inappropriate on this issue. The next issue of fact, however, is whether the 1997 Distributors Manual effectively modified the original agreement. In Indiana, the question of whether a modification has occurred is one of fact to be determined by a jury. *Gilliana v. Paniaguas,* 708 N.E.2d 895, 897 (Ind.Ct. App.1999); *see also, Zemco Manufacturing Inc. v. Pecoraro,* 703 N.E.2d 1064, 1072 (Ind.Ct.App.1998). Smith points out that the modification was without consideration, and that it effectively deprived Smith of substantial value in his instrumentation.

The Indiana Supreme Court has ruled in the context of at-will employment, that without consideration, a new employee handbook could not modify the employment relationship without consideration. *Orr v. Westminster Village North Inc.,* 689 N.E.2d 712 (Ind.1997). *See, also, Robinson v. Ada S. McKinley Community Services, Inc.,* 19 F.3d 359 (7th Cir.1994)(hold-

ing that the employer's unilateral issuance of a new employee handbook did not have the effect of modifying the original employment contract, in the absence of a bargained-for exchange). Therefore, a reasonable jury could also find for Smith on this issue, and conclude that the issuance of the new Distributors Manual did not have the effect of modifying the existing agreement. Therefore, Biomet's Motion for Summary Judgment on this issue is **DENIED**.

### 5. Claim Five: Violation of the Texas Sales Representative Act

The Texas Sales Representative Act provides that a principal that fails to pay commissions as required by the parties' contract to a sales representative is liable to the sales representative in a civil action for three times the unpaid commission plus reasonable attorney's fees and costs. Tex. Bus & Com Code, § 35.81, *et. seq.* Smith's claim under the Texas Sales Representative Act is based on Biomet's deduction of $13,906 from Smith's final commission check for inventory that was missing when Biomet performed its final inventory of Smith's account on July 13, 2001.

Smith claims that the missing inventory had been used for surgeries in his territory between the date he was terminated, on July 10, 2001, and the date Biomet performed the inventory on July 13. Smith's Mem. in Opp. at p. 22. One of Biomet's new distributor's for Smith's former territory acknowledged that surgeries were performed for Smith's former clients on July 11, 2001, and July 13, 2001, using inventory already in the hospital. *Id.,* and Ex. 6, LaGrange Dep, pp. 38–40. Based on this evidence, a reasonable jury could find that the missing inventory was used by Biomet and that Biomet wrongfully withheld commissions owed to Smith. Therefore, summary judgment is inappropriate on this Count and Biomet's Motion

to Dismiss on this count must be **DENIED**.

### 6. Claim Six: Interference with Prospective Business Advantage

Smith claims that Biomet interfered with his prospective business advantage in two ways: 1) by having other agents sell in his territory during the thirty days after notice of termination; and 2) by soliciting his sales agents and customers during the thirty day period, persuading at least one agent who had a contract with Smith to breach the contract. Biomet claims that it had a contractual right to terminate Smith, and that once Smith was terminated, their relationship was altered and Biomet and Smith were competitors.

Under Indiana law, Smith must prove five essential elements to recover for the tort of tortious interference with business relationships: "the existence of a valid business relationship; the defendant's knowledge of the existence of the relationship; the defendant's intentional interference in the relationship; the absence of any justification; and damages resulting from the defendant's interference." *Comfax Corp. v. North American Van Lines, Inc.,* 587 N.E.2d 118, 124 (Ind.App.1992). In this case, Smith has provided evidence that he had a valid business relationship with his sales agents and clients; Biomet knew of that relationship; Biomet intentionally interfered with that relationship when it solicited his agents to continue selling Biomet products; and damages resulted from that interference. Therefore, the issue is whether a reasonable jury could find that Biomet had no legal justification for its actions.

Biomet's two arguments, that it was contractually entitled to terminate Smith, and that once terminated Smith became a competitor, clearly protect Biomet from actions taken after the thirty day

notice period. It is not so clear that Biomet's actions were protected during the thirty day period that began when Smith received written notification and ended when he could be legally terminated thirty days later. The Court has already determined that by failing to give the thirty day notice before termination, Biomet technically breached the letter agreement, although the breach was found not to be material in the performance of the contract. That finding, however, is not dispositive on Smith's claim for tortious interference with prospective business advantage.

According to the letter agreement, Smith had the exclusive right to sell Biomet products in his territory while the agreement was in effect and for thirty days after he was notified that he was being terminated. A reasonable jury could concluded that because Biomet breached the notice provision, it had no legal justification to sell in Smith's territory, or to solicit his sales agents, during that thirty day period. Therefore summary judgment is inappropriate on this issue, and Biomet's Motion must be **DE-NIED.**

## V. CONCLUSION

For the foregoing reasons, Biomet's Motion to Strike is **DENIED.** Biomet's Motion for Summary Judgment is **GRANTED** as to Claims 2 and 3, and **DENIED** as to Claims 1, 4, 5, and 6. **IT IS SO ORDERED.**