Wayne T. SMITH, Counter–Plaintiff,

v.

BIOMET, INC., Counter–Defendant.

No. 3:01–CV–753 PS.

United States District Court,
N.D. Indiana,
South Bend Division.

March 24, 2005.

Barbara Kramer PHV, Mitchell A. Kramer PHV, Kramer & Kramer LLP, Rydal, PA, Edward W. Harris III, Sommer Barnard Ackerson PC, Indianapolis, IN, for Counter–Plaintiff.

Daniel P. Hann, Warsaw, IN, Elizabeth M. Keiley, H. Roderic Heard, Wildman Harrold Allen & Dixon LLP, Chicago, IL, for Counter–Defendant.

## OPINION AND ORDER

SIMON, J.

Plaintiff Wayne Smith was terminated from his position as the exclusive distributor of products for defendant Biomet, Inc. in Southwest Texas. He sued claiming principally that Biomet tortiously interfered with his prospective business relationships and then defamed him to boot. The matter proceeded to a jury trial with Smith obtaining a substantial verdict in his favor on all claims. This matter is before the Court on Biomet's renewed motion for judgment as a matter of law pursuant to Rule 50 or, in the alternative, for a new trial pursuant to Rule 59 [Doc. 167]. After a careful review of the record and the applicable legal standards, the Court now grants Biomet's motion for judgment as a matter of law on the tortious interference claim but denies it on all other claims.

## BACKGROUND

This case arises out of a long-term business relationship between Wayne Smith and Biomet. Biomet is in the business of manufacturing orthopedic implants such as artificial knees and hips, and is headquartered in Warsaw, Indiana. The evidence at trial established that the orthopedic implant business is largely driven by the relationships that are developed between local distributors like Smith and orthopedic surgeons in the territory. Local distributors are responsible for calling on or-

thopedic surgeons and convincing them to use Biomet implants on their patients. Most surgeons get comfortable using a particular manufacturer's implant and that preference develops into a brand loyalty.

Although there is substantial brand loyalty, the business is nonetheless highly competitive, and a distributor must continually service the orthopedic surgeons. Thus, for example, part of a distributor's job, in addition to wooing surgeons to use Biomet products in the first place, is to service the account by being present during surgeries to ensure that the surgeons have the proper types of instruments to actually do the surgery. The instruments are sold to Biomet distributors and are a cost of doing business for the distributors, and it is the distributor's responsibility to ensure that the appropriate instruments are on hand for scheduled surgeries. The instruments are not fungible. Each particular device has a special set of instruments that must be used during the implanting surgery.

### Smith's Termination as a Distributor

From October 1994, until July 2001, Smith was Biomet's exclusive distributor of orthopedic products in Southwest Texas. The letter agreement laying out the terms of the relationship between Smith and Biomet provided that Smith was an independent contractor and not an employee of Biomet. (Pl.Ex. 1.) The agreement also provided that either party could terminate the relationship, with or without cause, by giving the other thirty days written notice. (*Id.*)

Smith employed three sales reps who worked for him—Eli Garcia, Dan Cavazos and Anna Rose Arsenian. Each of these sales reps also worked within the office of an orthopedic surgeon and provided personalized service to those surgeons. This was because these surgeons were extremely important to Smith and Biomet due to the large volume of Biomet implants that they used.

Smith was terminated by letter, hand delivered by Biomet's Southwest Area Vice President, Terry Geurink, on July 10, 2001. (*See* Pl.Ex. 3.) The letter provided for Smith's immediate termination. According to Biomet, Smith was let go because he was not growing the market to Biomet's satisfaction. (*Id.*) The termination letter provided that Smith was to immediately "cease holding [himself] out as a Biomet distributor." (*Id.*) That same day, Biomet signed letter agreements with Mike LaGrange and Paul Eichler to become the Biomet distributors for Southwest Texas. LaGrange and Eichler divided up Smith's old territory.

Approximately two hours after delivering the termination letter to Smith, Geurink proceeded to call two of Smith's sales reps—Eli Garcia and Dan Cavazos. Geurink informed each of them that Smith had been fired and that new a distributor for each of their respective areas would be contacting them. A few days later, Geurink and Eichler met with the third of Smith's assistants, Anna Rose Arsenian. The meeting took place at the office of Dr. Swan, the surgeon with whom Arsenian was assigned to work with by Smith. Dr. Swan was so upset about Smith's termination, he kicked them out of his office before they could even bring up potential employment opportunities with Arsenian.

On the day of his termination, Wayne Smith faxed a letter to Biomet requesting that an audit of his Biomet inventory be performed that very day because he did not want to lose control over the inventory because he would not be calling on surgeons at hospitals or assisting in any surgeries after that date. (*See* Pl.Ex. 17.) Biomet chose not to immediately perform the audit.

On August 24, 2001, Smith received his final commission check from Biomet. The check contained a $13,906.50 deduction for inventory that Biomet claimed it could not locate when it performed the audit. However, one of Biomet's new distributors, Mike LaGrange, testified that surgeries were performed for Smith's former clients on the days immediately following Smith's termination. According to LaGrange, Biomet inventory was present at the hospitals to be used for those surgeries. That was inventory that Smith was likely responsible for, and some of this inventory was used to perform the surgeries.

### The Defamation Claim

About a month after Smith's termination, on August 7, 2001, Peter Rockwood a sales representative for Depuy, a Biomet competitor, ran into Smith at a hospital in Corpus Christi, Texas. Smith and Rockwood were business acquaintances. According to Rockwood, Smith told him about his termination from Biomet and the problems he was having in bringing his relationship with Biomet to an end. Smith then said that if he did not get what he wanted from Biomet, he would take a gun to Warsaw and settle it himself. According to Rockwood, Smith was not angry when he made the statement, did not raise his voice and did not appear upset although he was plainly unhappy with Biomet. (Pl.Ex. 46 at 10–11.) Rockwood testified that he did not take the threat seriously; he thought Smith was just blowing off some steam. (*Id.* at 39.) For his part, Smith adamantly denied ever making any threat to Rockwood about Biomet, whether in a joking manner or otherwise. (Tr. vol. 2, at 128–29.)

Approximately a month later or so, Rockwood spoke with Terry Geurink from Biomet. Geurink resides in San Antonio, Texas. (Pl.Ex. 46 at 37.) Although they were competitors, Rockwood and Geurink were friends. (*Id.*) According to Rockwood, he and Geurink were talking on the phone about a variety of subjects, and at the end of their conversation, Rockwood mentioned in an off hand way that he had run into Wayne Smith in Corpus Christi. This was a reference to the August 7th meeting at the hospital between Smith and Rockwood. Rockwood then relayed to Geurink what Smith had said to him—that if his lawyers could not get things resolved with Biomet, he was going to take his gun and go to Warsaw and settle it himself. (Tr. vol. 4, at 66.). Importantly, at no time did Rockwood allege that Smith said that he was planning to go to the Biomet shareholders' meeting.

Geurink was concerned about what Rockwood had told him and so he called Dave Montgomery, Biomet's Vice President of Sales (who worked at Biomet's Warsaw, Indiana headquarters) and told him what Rockwood had said to him about Smith. (Tr. vol. 4, at 66–67.) Montgomery went immediately to Gary England, Biomet's Chief Operating Officer and told him what Geurink had called and said. (*Id.* at 141.) England told Montgomery to go directly to Dan Hann, Biomet's General Counsel, which he did, and relayed to him exactly what Geurink had told him. (*Id.*) Montgomery did not tell Hann anything about Smith coming to the Biomet shareholders' meeting. (*Id.* at 141–42.)

Another several weeks later, Biomet received a proxy from Smith concerning voting his Biomet shares to himself as Director. Biomet also received a note that indicated that Smith was planning to attend the annual shareholders' meeting on September 29, 2001, in Warsaw, Indiana. The conclusion was drawn by Biomet that Smith's alleged threat concerning settling matters with a gun—made some seven weeks earlier—was somehow connected to him attending the annual shareholders' meeting. (*See* Tr. vol. 4, at 178.) There

was absolutely no evidence presented that Smith ever said to Rockwood that he was going to take a gun to the shareholders' meeting. Rather, the threat made by Smith, if one believes Rockwood (remember, Smith denied making *any* threat), was much less specific. It was Biomet who turned the general threat made by Smith into a much more specific one.

The evidence established that, at some point, Geurink told Mike LaGrange—one of Biomet's distributors who replaced Smith—about Smith's alleged threat. (Pl. Ex. 42 at 54–55.) LaGrange testified that he passed this information on to Dr. Bassett. (Pl.Ex. 44 at 17–18.) But when it was passed on to Dr. Bassett, the whole tenor of the statement was changed. Suddenly, Biomet, through LaGrange, was claiming that Smith was threatening to come to the Biomet shareholders' meeting with a gun. (Pl.Ex. X at 13–14.) Dr. Bassett was one of the high volume surgeons who used Biomet implants and was one of the doctors who Smith had developed a relationship with. There was also evidence that Dr. Swan, another of Smith's high volume customers, heard about Smith's alleged threat, but Dr. Swan could not identify who he heard the statement from. (Pl.Ex. 48A at 12.)

Bassett's testimony about his conversation with LaGrange was corroborated by Dan Hann, Biomet's General Counsel. Hann spoke with Dr. Bassett who told him that he heard that Smith had threatened to bring a gun to Biomet's annual shareholders' meeting. (Tr. vol. 3, at 175.) As mentioned, Dr. Bassett had heard this from Biomet's distributor, Mike LaGrange. (Ex. 44 at 17–18.)

In sum, Smith (allegedly) made the general threat to Rockwood who made nothing of it. About a month later, Rockwood mentioned the conversation that he had had with Smith to Biomet's Geurink. After the issue bounced around Biomet for awhile, Geurink relayed the threat to Biomet's LaGrange who in turn told it to Dr. Bassett. But the statement as told to Bassett was different. It added the part about Smith specifically saying he was coming to the shareholders' meeting with a gun.

### The Filing of the Lawsuit

On September 26, 2001, Biomet instigated this litigation in state court when it filed a petition for protective order seeking to prevent Smith from coming to the shareholders' meeting. Based upon the *ex parte* request of Biomet, the state court judge issued a restraining order preventing Smith from coming to the shareholders' meeting. On November 7, 2001, Smith filed a counterclaim against Biomet alleging a variety of claims arising out of his termination and Biomet's actions concerning his alleged threat.[1]

Smith's complaint alleged six causes of action: 1) that Biomet breached its contract by terminating him without giving him thirty days notice as required by the parties' original letter agreement; 2) that Biomet breached its contract by refusing to repurchase the instruments that Smith had purchased from Biomet; 3) abuse of process; 4) defamation relating to Biomet's publishing of a statement that Smith had stated that he was going to take a gun to the Biomet annual shareholders' meeting and settle matters with it there; 5) tortious interference with business rela-

---

1. Biomet dismissed its original claim relating to the protective order after the parties entered into a consent decree. (*See* [Doc. 144].) That left the counterclaims brought by Smith against Biomet. For simplicity sake, instead of referring to Smith as the "Counter–Plaintiff" and Biomet as the "Counter–Defendant," they are referred to in this Order as simply Plaintiff and Defendant, respectively.

tions; and 6) a violation of the Texas Sales Representative Act for failure to pay Smith all commissions due after his termination. The matter was then removed to federal court.

At the close of discovery, Biomet moved for summary judgment on all of Smith's claims. Judge Allen Sharp, the then presiding judge, granted Biomet's motion for summary judgment on the contract claim relating to the thirty days notice and the abuse of process claim. In particular, Judge Sharp found that this breach of the parties' contract was not material because Smith was paid his commissions for his territory for the thirty day period following his termination. *See Biomet, Inc. v. Smith,* 238 F.Supp.2d 1036, 1050–51 (N.D.Ind.2002). During this thirty day period, Smith was also free to seek a new distributorship from any one of Biomet's competitors. Judge Sharp denied summary judgment on the remaining four claims.

At the close of Smith's case, Biomet moved for judgment as a matter of law as to all of Smith's claims. The Court denied the motion. At the close of all of the evidence and before the case was submitted to the jury, Biomet again moved for judgment as a matter of law as to all of Smith's claims. The Court granted Biomet's motion as to Smith's breach of contract claim for failure to repurchase instruments. (Tr. vol. 5, at 25–40.) On the remaining three claims—tortious interference with business relations, defamation, and violation of the Texas Sale Representative Act—the Court decided to submit the matter to the jury.

After a week long trial, on April 2, 2004, the jury found for Smith on all three of his claims. The jury awarded Smith the sum of $900,000 on his claim of tortious interference with business relations—$400,000 in compensatory damages and $500,000 in punitive damages. On his claim of defa-

mation, the jury awarded Smith the sum of $400,000—$300,000 in compensatory damages and $100,000 in punitive damages. Finally, the jury found that Biomet violated the Texas Sale Representative Act and awarded Smith the sum of $13,906.50. Pursuant to the Texas Sale Representative Act, that amount was trebled by the Court to $41,719.50. (*See* [Doc. 156].) The total judgment was therefore in favor of Smith in the amount of $1,341,719.50.

Defendant Biomet renewed its motion for judgment as a matter of law following the trial seeking to set aside the jury's verdict, or, alternatively, moving for a new trial. Biomet contends that it is entitled to judgment as a matter of law in its favor and against Smith on all of Smith's claims.

## LEGAL STANDARD

When ruling on a motion for judgment as a matter of law following a jury verdict, the court does not re-weigh the evidence presented at trial or make credibility determinations. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Instead, considering the totality of the evidence, the court determines whether the jury was presented with a "legally sufficient amount of evidence from which it could reasonably derive its verdict." *Massey v. Blue Cross–Blue Shield of Ill.,* 226 F.3d 922, 924 (7th Cir.2000). In other words, in this matter the Court must determine whether any rational jury could have found for the Plaintiff in light of the record. *Harvey v. Office of Banks & Real Estate,* 377 F.3d 698, 707 (7th Cir.2004). The evidentiary record is construed in the prevailing party's favor, drawing all reasonable inferences in that party's favor and resisting any temptation to weigh the evidence or have the court make its own credibility determinations. *See Appelbaum v. Milwaukee Metro. Sewerage Dist.,*

340 F.3d 573, 579 (7th Cir.2003). Simply put, overturning a jury verdict is not something the courts may do lightly. *See Massey*, 226 F.3d at 925. The Court now turns to whether judgment as a matter of law is appropriate on Smith's tortious interference with business relations claim, defamation claim, and violation of the Texas Sales Representative Act.

## I. *Tortious Interference with Business Relations*

 Under Indiana law, the elements of a claim for tortious interference with a business relationship are: (1) the existence of a valid relationship; (2) the defendant's knowledge of the existence of the relationship; (3) the defendant's intentional interference with that relationship; (4) the absence of justification; and (5) damages resulting from defendant's wrongful interference with the relationship. *See Levee v. Beeching*, 729 N.E.2d 215, 222–23 (Ind.Ct.App.2000). The plaintiff must also prove that the defendant acted *illegally* in achieving its end. *See Brazauskas v. Fort Wayne–South Bend Diocese, Inc.*, 796 N.E.2d 286, 291 (Ind. 2003) (tortious interference requires some independent illegal action); *AutoXchange.com, Inc. v. Dreyer & Reinbold, Inc.*, 816 N.E.2d 40, 51–52 (Ind.Ct.App. 2004); *Harvest Life Ins. Co. v. Getche*, 701 N.E.2d 871, 876–77 (Ind.Ct.App.1998); *Watson Rural Water Co., Inc. v. Ind. Cities Water Corp.*, 540 N.E.2d 131, 139 (Ind. Ct.App.1989).

Biomet's motion for judgment as a matter of law must be granted for two reasons. First, Smith presented no evidence that there was an absence of justification for Biomet's actions, and thus there was no evidence on the fourth element of the claim. Second, Smith failed to establish that Biomet acted illegally in achieving its end.

## A. Smith Failed to Prove that Biomet's Actions Were Not Justified

 In a tortious interference with business relations claim, Indiana law requires that the plaintiff prove that the defendant acted without justification. *See e.g., Harvest Life Ins. Co.*, 701 N.E.2d at 876. In other words, the plaintiff must show that the defendant acted exclusively to harm the plaintiff's business interest. *Morgan Asset Holding Corp. v. CoBank, ACB*, 736 N.E.2d 1268, 1272 (Ind.Ct.App.2000) (affirming dismissal of tortious interference claim where plaintiff failed to allege that defendant acted exclusively to harm plaintiff's business interests). Thus, if a legitimate reason exists for the defendant's actions, the necessary justification exists to avoid liability. *Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1236 (Ind. 1994).[2]

On the issue of whether there is an absence of justification, Indiana courts look to the Restatement of Torts which states that if a defendant's "purpose is at least in part to advance his interest in competing with the other," then there can be no "absence of justification." Restatement (Second) Torts, § 768(1)(d). In *Winkler*, for example, the Supreme Court of Indiana held that a defendant who is motivated in part by his own legitimate business interest is not acting in the absence of justification. *Id.* at 1236; *see also Harvest Life Ins. Co.*, 701 N.E.2d at 877 (pursuing a legitimate business interest is

**2.** Although *Winkler* involved a tortious interference with contract claim and not a claim for tortious interference with business relations, both torts have "absence of justification" as an element. There is no reason to suppose that the Indiana Supreme Court would treat the "absence of justification" element differently in a tortious interference with business relations claim than how it treated that same element in *Winkler*.

justified); *Europlast, Ltd. v. Oak Switch Sys., Inc.*, 10 F.3d 1266, 1274 (7th Cir. 1993) (a competitor may "woo an at-will employee away from his employer" provided he is not inducing the employee to, for example, reveal confidential information of the employer).

The substance of Smith's tortious interference claim is as follows: Throughout Smith's tenure as a Biomet distributor, Smith had three sales reps that worked for him: Eli Garcia, Dan Cavazos, and Anna Rose Arsenian. Smith alleged that Biomet tortiously interfered with his business relationships with his sales reps when it ostensibly hired Garcia and Cavazos away from him after his termination. (*See* Tr. vol. 2, 167–68.) Smith also alleged that Biomet tortiously interfered with his customers— Dr. Swan and Dr. Bassett—following his termination.

Importantly, Smith's contract with Biomet did not contain any language that forbid Biomet from contacting Smith's sales representatives, either before or after Smith's termination. (*See* Pl.Ex. 1.) It also came to light that Smith never had a signed employment agreement with Dan Cavazos. (Tr. vol. 2, at 163–64.) Moreover, Eli Garcia's contract with Smith was signed in 1993, but was only for a one-year term. (*Id.* at 164; Pl.Ex. 15.) Smith, however, testified that Garcia understood that the agreement automatically renewed year to year, but there was no language in the contract that indicated as such. Because Smith had no up-to-date signed contracts at the time of his termination, he likely had no choice but to sue Biomet for tortious interference with business relations rather than tortious interference with contract.

Proof of Smith's tortious interference claim rested essentially upon the testimony of one individual, Biomet's Terry Geurink. Geurink testified that on July 10, 2001, approximately an hour and half to two hours after hand delivering Smith his termination letter, he made a phone call to Smith's sales rep, Eli Garcia. (Tr. vol. 4, at 59.) Geurink notified Garcia that Smith "was not the distributor for Biomet anymore, and that the new distributor, Mr. Paul Eichler, would like to talk to [him] about future employment." (*Id.*) During this same conversation, Geurink asked Garcia if he had a contract with Smith, and Garcia informed him that he did not. (*Id.*) The only thing else Geurink said to Garcia was that Paul Eichler would be calling him. Geurink did not offer Garcia a job. Garcia did in fact go to work for Eichler selling Biomet products. The jury only had Geurink's version of this conversation to consider because Garcia did not testify.

Geurink also testified that at approximately the same time on July 10, 2001, he called Dan Cavazos and explained to him that Smith was not Biomet's distributor anymore and that there would be a new distributor, Mike LaGrange. Geurink explained to Cavazos that Mike LaGrange would be calling him to see if he would be interested in employment with him. (*Id.* at 60.) (Like Garcia, Cavazos was not called as a witness). Cavazos has since gone to work for LaGrange. Geurink did not play any part in any conversations or negotiations between Eichler and Garcia or between LaGrange and Cavazos. (*Id.* at 60–61.)

While working for Smith as a sales rep, Dan Cavazos also worked full-time for Dr. Bassett. Dr. Bassett was a design doctor for Biomet and a loyal customer who only used Biomet's total knee products. However, Smith testified that if he had been able to pick up a trauma line or total hip line from a different manufacturer, there was a good chance that Cavazos would have stayed with him as a sales rep for those specific lines of product because Dr.

Bassett did not use Biomet products in those areas.

After Smith's firing, Geurink and Eichler made an appointment with Arsenian and Dr. Swan, the surgeon with whom she worked. Dr. Swan was very upset about Smith's termination, and before Geurink and Eichler could speak to Arsenian about any potential employment opportunities, they were thrown out of his office. (*Id.* at 61–62.)[3] Geurink never spoke to Arsenian about a position with Biomet, and Arsenian never went to work with either of the new Biomet distributors.

■ In short, Smith offered no evidence to establish that Biomet acted with an "absence of justification" when it contacted his sales reps. In fact, all of the evidence was to the contrary. When Geurink contacted Smith's sales representatives to tell them about Smith's termination and to inform them about a potential employment opportunity with Biomet's new distributors, he was acting to preserve Biomet's business in Smith's old territory. The same is true for the contacts with Smith's customer's, the surgeons who used the products. Biomet presented evidence that it was motivated by protecting its legitimate business interests when these contacts were made. Smith presented nothing in response on this score. Because there was no evidence, for example, that Biomet "made misrepresentations, applied unfair economic pressure or threatened litigation" during its discussions with Smith's sales reps or the surgeons, *Winkler*, 638 N.E.2d at 1235, Smith failed to meet his burden on the fourth element of the claim.

Smith argues that he and Biomet were not competitors so the argument based on the Restatement of Torts as discussed

above is not on point. But the evidence is clear that after Biomet terminated Smith, they were in competition with one another for the services of the sales reps—Garcia, Cavazos and Arsenian. Biomet contacted these three on behalf of the new distributors. Biomet told them that if they were interested in working with the distributors who were replacing Smith, that a position would be available to them. Vying for the services of these sales reps is a legitimate business justification.

Based on this evidence and viewing the evidence in a light most favorable to Smith, the Court concludes that there was not sufficient evidence—indeed, there was no evidence—that would enable a reasonable jury to determine that Biomet's actions were taken with an absence of justification. Judgment as a matter of law on the claim of tortious interference with business relations is therefore appropriate.

**B. Smith Failed to Prove that Biomet's Conduct Satisfied the Illegality Requirement**

■ Smith also failed to prove that Biomet acted illegally when it contacted his sales representatives and former customers. This is a separate and independent reason why judgment as a matter of law is proper on Smith's tortious interference claim. Smith had to prove that Biomet acted illegally when it interfered with his business relations. *Brazauskas*, 796 N.E.2d at 291. Unfortunately, "Indiana courts have not defined 'illegality' nor have they articulated a test for a showing of 'illegal conduct.'" *Gaskins v. Vencor, Inc.*, No. IP99–1122–C–T/G, 2001 WL 300517, at *26 (S.D.Ind. Mar.26, 2001) (cit-

---

**3.** Apart from speaking with Dr. Bassett, a Biomet product designer who had weekly phone conversations with Biomet, (Tr. vol. 4, at 64), Geurink's brief conversation with Dr. Swan was the only evidence introduced at trial regarding Biomet's alleged tortious interference with Smith's customers. These communications were not unjustified and Biomet's interactions with Smith's customers does not rise to the level of tortious interference.

ing *Bradley v. Hall,* 720 N.E.2d 747, 751 n. 3 (Ind.Ct.App.1999) ("Illegality is not a term of art, and no court has defined the meaning of 'illegal' as used in this context.")). This leaves the Court in the position of attempting to determine what type of activity actually satisfies the illegality requirement for the tort of interference with business relations.

The Seventh Circuit has explicitly rejected the suggestion that only a criminal act may be "illegal conduct." *See Syndicate Sales, Inc. v. Hampshire Paper Corp.,* 192 F.3d 633, 641 (7th Cir.1999) ("courts interpreting Indiana law have held that non-criminal illegal acts are sufficient"). In *Syndicate Sales,* the Court held that dilution of a trademark could be "illegal conduct" sufficient to establish the illegality requirement of a tortious interference with business relations claim. In addition, *Syndicate Sales* cited favorably to two other cases as examples of non-criminal conduct that would establish the illegality requirement. *See id.* (citing *United States ex. rel. Durcholz v. FKW, Inc.,* 997 F.Supp. 1143, 1153 (S.D.Ind.1998) (violations of the False Claims Act meets "illegality" requirement for a tortious interference with business relations claim); *Moffett v. Gene B. Glick Co., Inc.,* 604 F.Supp. 229, 239 (N.D.Ind.1984), *rev'd on other grounds* (invasion of privacy and intentional infliction of emotional distress satisfies "illegal conduct" requirement)).

We also have some guidance from the Indiana Court of Appeals as to whether defamation can be considered "illegal conduct" for purposes of a claim for tortious interference with business relations. In *Levee,* the Court specifically held that defamation is *not* "illegal conduct" for claims of tortious interference with business relations. *See Levee,* 729 N.E.2d at 222–23.

Moreover, the Southern District of Indiana, relying on the reasoning of *Winkler,* 638 N.E.2d at 1235, found that a breach of contract alone is not sufficient "illegal conduct" for purposes of a tortious interference with business relations claim. *See HAS, Inc. v. Bridgton, Inc.,* No IP 98–0167–C H/G, 1999 WL 1893209, at \* 16 (S.D.Ind. Sept.20, 1999). We find that reasoning persuasive because the Indiana Supreme Court has long expressed concern that tort remedies should not displace traditional contract remedies. *Zemco Mfg., Inc. v. Navistar Int'l Transp. Corp.,* 186 F.3d 815, 822 (7th Cir.1999). To hold otherwise would be to "transmute the breach into the tort of tortious interference with business relations." *Jeppesen v. Rust,* 8 F.3d 1235, 1239 (7th Cir.1993). As the *Jeppesen* court has stated, allowing a breach of contract to be characterized as a tortious interference with business relations would make the tort a sort of "wild card" that would lead to the award of punitive damages for simple breaches of contract. These cases provide at least some guidance for determining whether there was evidence to support the jury finding that Biomet acted illegally.

Biomet argues that Smith failed to prove his tortious interference claim because the only wrongful conduct which Smith identified at trial was Biomet's purported breach of contract. We agree. Indeed, during argument on Biomet's Rule 50 motion at trial, Smith admitted:

> With respect to the tortious interference claim, the breach of contract and the fact that he was supposed to have exclusivity is the wrongful—is the unjustified act that gives rise to the tort. The contract itself did not preclude Biomet from contacting the sales people, contacting the customers. That is the tort. What makes it wrongful is, of course, the fact that the contract precluded the unnotified termination in an exclusive territory.

(Tr. vol. 5, at 12.) When pushed harder by the Court to articulate Biomet's unjust—i.e. illegal—behavior Smith stated, "[t]he unjust behavior was contacting the sales people and the customers during the period of time when Mr. Smith was supposed to have exclusivity in the territory." (*Id.* at 13.) Smith's argument is without merit because this is simply another way of saying that the illegal or wrongful conduct at issue in this case, was the breach of the contract. But as shown above, breach of contract is not "illegality" for purposes of a claim of tortious interference with business relations. *See HAS, Inc.,* 1999 WL 1893209, at * 16.

There is no evidence that Smith was supposed to have exclusivity in the territory after his termination, and even if there was, Biomet's actions would amount to nothing more than a breach of contract. As Judge Sharp previously ruled in this matter, Biomet's termination of Smith without the required thirty days notice was a breach of contract, but it was not a material breach because Smith was compensated for the commissions from his territory by Biomet for the entire period. *See Biomet, Inc.,* 238 F.Supp.2d at 1050–51. This same behavior—the unnotified termination in an exclusive territory—cannot be converted into a tort.

Smith's exclusivity in the territory ended on July 10, 2001, the time of his termination. Smith understood this because he did not distribute any Biomet products after that date. Instead, Smith knew that he was free to go look for a new distributorship from any one of Biomet's competitors. To be sure, Smith wanted to retain his sales reps because they made him a more attractive distributor and could help him land a competitor's account. But Biomet's telephone calls informing Garcia and Cavazos that Smith was fired and that there may be other employment opportunities for them is not "illegal" conduct.

█ Simply put, it was not "unjust" or "illegal" for Biomet to contact Smith's sales reps after it terminated him. There was nothing in the contract that prevented Biomet from doing so. Thus, as a matter of law, this is not "illegal" conduct, and therefore is not evidence of tortious interference with business relations.[4] *See HAS,* 1999 WL 1893209, at *16.[5]

Moreover, Smith's new conversion argument also cannot save his tortious interference claim. For the first time after trial, Smith contends that Biomet's failure to pay him all of his commissions due after his termination amounted to conversion of his property, and satisfies the illegality requirement of his tortious interference with business relations claim. (*See* Pl. Opposition at 6–7.) Smith's argument is misplaced. Any alleged conversion took place over a month after Smith was terminated—on or about August 24, 2001—when he received his last commission check. It is impossible that Biomet's failure to pay

---

4. At trial, the jury found that Biomet defamed Smith. However, as previously discussed, defamation is not "illegal conduct" for a tortious interference with business relations claim, and does not salvage Smith's claim. *See Levee,* 729 N.E.2d at 222–23.

5. Likely anticipating this result, Smith urges the Court to allow Smith a "new" trial on Smith's claim for breach of contract (for improper termination) if any part of the jury verdict awarding Smith damages for tortious interference with business relations is set aside. (*See* [Doc. 160].) Such relief is unwarranted, and is hereby denied. While Judge Sharp previously granted summary judgment to Biomet on Smith's breach of contract claim for Biomet's failure to provide Smith with 30 days' notice of termination, Smith never alleged breach of contract based upon Biomet's violation of the exclusivity provisions of his contract. Any absence of a contractual remedy, therefore, resulted from Smith's failure to plead such a claim.

Smith for all of his commissions in late August, could be the illegal conduct that Biomet engaged in to tortiously interfere with Smith's sales reps and customers in early July. *See Harvest Life Ins.*, 701 N.E.2d at 876–77 (Indiana law requires that the plaintiff prove that the defendant acted illegally in *achieving* its end). Here, Biomet's withholding of Smith's commissions had nothing to do with its relationship with Smith's sales reps and customers and cannot salvage his claim.

While we do not lightly overturn a jury verdict, *Massey*, 226 F.3d at 925, after thoroughly reviewing the evidence in this case on the claim of tortious interference with business relations, we are left with the firm view that there was simply no evidence on two crucial elements. We therefore have no choice but to enter judgment as a matter of law in favor of Biomet.

## II. *Defamation*

The jury found that Smith was defamed by Biomet. While the evidence on the defamation claim was certainly not overwhelming, there was enough for a rational jury to have found for the Plaintiff in light of the record. *Harvey*, 377 F.3d at 707. Biomet's motion for judgment as a matter of law on the defamation claim is therefore denied.

▮▮▮▮▮ To establish a claim of defamation, a plaintiff must prove the following elements: (1) a communication with defamatory imputation, (2) malice, (3) publication, and (4) damages. *Trail v. Boys & Girls Club of Northwest Ind.*, 811 N.E.2d 830, 841 (Ind.Ct.App.2004); *Davidson v. Perron*, 716 N.E.2d 29, 37 (Ind.Ct.App. 1999), *trans. denied.* "A statement is defamatory if it tends to harm the reputation of another so as to lower him in the esti-

mation of the community or to deter third persons from associating or dealing with him." *Gatto v. St. Richard Sch., Inc.*, 774 N.E.2d 914, 923 (Ind.Ct.App.2002). "The publication element requires the plaintiff to show that the defamatory matter was 'published,' that is, communicated to a third person or persons." *Mart v. Hess*, 703 N.E.2d 190, 194 (Ind.Ct.App.1998). The malice element requires the plaintiff to show publication of the statement with knowledge of its falsity or with reckless disregard of its truth or falsity. *McQueen v. Fayette County Sch. Corp.*, 711 N.E.2d 62, 67 n. 2 (Ind.Ct.App.1999), *trans. denied.*[6]

### A. The Defamatory Statement

The defamatory statement at issue in this case is Biomet's representative Mike LaGrange telling Dr. Bassett that Wayne Smith threatened to go to Biomet's annual shareholders' meeting and settle matters with a gun. (*See* Def. Ex. X at 14–15.) If, as Biomet contends, Wayne Smith made this statement, then Biomet's statement was true and it has a defense. *Doe v. Methodist Hosp.*, 690 N.E.2d 681, 687 (Ind. 1997). But the evidence is undisputed that Smith *never* made that statement.

Biomet's Geurink testified that Peter Rockwood called him and told him that Smith said "that if his lawyers can't resolve this thing with Biomet, he's going to take his gun and go to Warsaw and resolve it." (Tr. vol. 4, at 66.) The evidence showed that Rockwood did not relay this information to Geurink until at least a month after his conversation with Smith. (*Id.* at 80.) Rockwood testified that he did not take Smith's alleged comment seriously, and that if he had, he would have called

**6.** Judge Sharp questioned in his summary judgment order whether a showing of malice was required under the circumstances of this case. *See Biomet, Inc.*, 238 F.Supp.2d at

1046. Regardless, the evidence introduced at trial permitted a jury to find that Biomet acted with malice.

somebody immediately. (Pl.Ex. 46 at 38.) As Rockwood explained it, Smith's comment was simply his way of being "dramatic." (*Id.* at 37.)

Guerink repeated what Rockwood had told him to Dave Montgomery, who repeated it to Gary England and Dan Hann. After discussions about the threat bounced around Biomet headquarters for awhile, at some point in September 2001, Geurink relayed the threat to LaGrange, who in turn relayed it to Dr. Bassett. But the statement as told to Dr. Bassett was different. It added the part about Smith specifically saying he was coming to the shareholders' meeting with a gun.

Indeed, Biomet's Montgomery candidly admitted that Rockwood never said that Smith threatened to come to the shareholders' meeting with a gun. (Tr. vol. 4, at 146.) This fact was corroborated by Rockwood himself, who testified that he found out about Biomet's annual shareholders' meeting when he was told about it by Biomet President Dane Miller and Dan Hann in September 2001. (*See* Pl.Ex. 46 at 15, 18.) The evidence was clear that Biomet merely assumed that Smith would come to the annual shareholders' meeting with a gun, and this is what led Biomet to alter the statement. As Dave Montgomery, Biomet's Vice President of Sales, testified:

> The assumption was based upon the report we had from Mr. Geurink that Mr. Smith intended to come to Warsaw with a gun to settle his differences. That, coupled with this note that was sent to other distributors, and apparently this note I received voting his shares to himself, the conclusion was drawn that what better time to come to Warsaw than during the shareholder meeting.

(Tr. vol. 4, at 178; *see also* 147.)

While the statement Smith allegedly uttered to Rockwood may have been threatening in a general sense, it lacked speci-

ficity in both time and place. Biomet's alteration of the statement to add that Smith was coming to the annual shareholders' meeting (scheduled to take place on September 29, 2001, in Warsaw, Indiana) with a gun made the threat seem much more specific, both in time and in place, and thus much more imminent. As a matter of law, the Court found that this change—adding the information concerning the annual shareholders' meeting to the alleged threat—altered the harmful aspect of the statement making the threat seem considerably more serious and imminent. *See Biomet, Inc.,* 238 F.Supp.2d at 1047–48; *cf. Vachet v. Cent. Newspapers, Inc.,* 816 F.2d 313, 313 (7th Cir.1987) (inconsistency in "inoffensive details of secondary importance"—e.g., whether someone was arrested pursuant to a warrant or authorized by state statute—which do not alter the harmful aspects of the statement do not defeat the truth defense).

■ Biomet relies on *Heeb v. Smith,* 613 N.E.2d 416 (Ind.Ct.App.1993), for the proposition that the truth defense is established if the "gist" or "sting" of the statement was true. Biomet claims that the sting of the statement that it uttered—that Smith said that he was coming to the shareholders' meeting with a gun—was true. But this argument ignores the fact that "The test for determining whether a statement is substantially true is whether any inaccuracies caused the statement to produce a different effect on the audience than would have been produced had the literal truth been spoken." *Heeb,* 613 N.E.2d at 421. Because there was some evidence that Biomet substantially changed the gist of Smith's alleged statement as told to Rockwood by making the threat more serious and imminent, the truth defense is unavailable to it.

### B. Publication and Malice

There was also evidence that Biomet published the defamatory statement. The plaintiff submitted evidence that Mike LaGrange, Biomet's new distributor, published the defamatory statement to Dr. Bassett, Smith's former customer, in September, 2001. (*See* Tr. vol. 3, at 175; Pl.Ex. 44 at 17–18.) This was corroborated by the fact that Daniel Hann, Biomet's General Counsel, testified that Dr. Bassett told him during a September 2001, telephone conversation that Smith had threatened to take a firearm to the annual meeting. (Tr. vol. 3, at 175.) There is also evidence that LaGrange told Dan Cavazos, Smith's former employee, about the alleged threat, (Pl.Ex. 42 at 57.) In addition, Dr. Swan testified that he heard about the alleged threat, but he could not identify who he heard it from. (Pl.Ex. 48A at 12.) Thus, at the very least, a rational jury could have readily found that the defamatory statement was communicated to a third party—Dr. Basset.

Biomet takes issue with being held liable for a defamatory statement published by its distributor, Mike LaGrange.[7] While LaGrange was an independent contractor, an agency relationship may have nonetheless existed between them. Under Indiana law, whether an agency relationship exists and the scope of the agent's authority is a question of fact for the jury. *Coca–Cola Co. v. Babyback's Int'l, Inc.*, 806 N.E.2d 37, 46 (Ind.Ct.App. 2004), *trans. denied; Johnson v. Blankenship*, 679 N.E.2d 505, 507 (Ind.Ct.App. 1997), *trans. granted and summarily aff'd*, 688 N.E.2d 1250 (Ind.1997). Here, there was a question of fact as to whether LaGrange was or was not an agent of Biomet.

The Court refused to make a ruling at trial on the issue, finding that "the matter of his agency is a question for the jury to decide." (Tr. vol. 1, at 56.) Accordingly, the jury was extensively instructed on Indiana agency law, (*see* [Doc. 150] at Instructions 14–19), and evidently found that LaGrange had at least some authority to speak on behalf of Biomet.

Authority can be either actual or apparent. Actual authority "is created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account." *Gallant Ins. Co. v. Isaac*, 751 N.E.2d 672, 675 (Ind.2001) (internal quotes omitted). Apparent authority, on the other hand, "refers to a third party's reasonable belief that the principal has authorized the acts of its agent; it arises from the principal's indirect or direct manifestations to a third party and not from the representations or acts of the agent." *Id.*

There was evidence introduced that Biomet gave its exclusive distributors actual or apparent authority. To begin with, the parties stipulated to the fact that distributors, like LaGrange, were Biomet's "representatives" in the field to provide assistance about Biomet products to surgeons. (Tr. vol. 2, at 25.) Thus, distributors not only call on surgeons to sell them Biomet products they are available to answer questions about the products and are present during the surgeries to provide technical advice to the surgeons. So for all practical purposes, the exclusive distributor is the face of Biomet in his territory. The only contact that surgeons have

---

7. Biomet also argues that it cannot be liable for publishing the defamatory statement to LaGrange because Biomet and LaGrange have a common interest. The Court need not address this argument because it is meaningless. The publication at issue is not to LaGrange from Biomet, but from LaGrange to Dr. Bassett. *See Biomet, Inc.*, 238 F.Supp.2d at 1046–47.

with Biomet is through their exclusive distributor or his sales reps.

According to Biomet's Geurink, the key to Biomet's business is for distributors to develop a close and trusting relationship with surgeons. (Tr. vol. 4, at 27.) To do this, distributors have to represent Biomet and vouch for the quality of the Biomet products. Indeed, Biomet's distributor agreement gives the distributor the "exclusive right to promote the sale of products of Biomet" and to act as a "representative" for Biomet. (Pl.Ex. 1; Tr. vol.4, at 109.) But, to be fair, the distributor agreement also states that Biomet distributors are not "authorized to transact business, incur any obligations in the name or for the account of Biomet, nor on Biomet's behalf to make any promise, warranty or representation with respect to Biomet Products." (Pl.Ex. 1.)

Apart from the distributor letter agreement, additional documentary evidence was introduced of Biomet's distributors authority to act on behalf of Biomet. For example, in Biomet's termination letter to Smith, it specifically stated that: "After July 10, 2001, you must cease holding yourself out as a Biomet distributor and take appropriate action to delete the Biomet name and all Biomet trademarks from your stationery and promotional materials." (Pl.Ex. 3.) Clearly, surgeons interacting with a distributor who communicates with them on Biomet stationery could reasonably believe that Biomet authorized the distributor to act on its behalf.

■ Considering all of this evidence, a rational jury could have found that by giving LaGrange the exclusive right to promote and "represent" Biomet, Biomet was vesting in him the requisite authority. At bottom, it was for the jury to decide, and Biomet's efforts to divorce itself from LaGrange were obviously unpersuasive to the jury.

Biomet's further argument that it was merely a republisher of the statement— that is, that it was simply repeating what Rockwood said—is simply not the case as was already discussed. The affidavit signed by Rockwood and prepared by Hann in order to obtain the protective order made no reference to the annual shareholders' meeting. (Def.Ex. K.) Rockwood himself testified that he knew nothing about an annual meeting until he was told about it by Biomet President Dane Miller and Dan Hann. (See Pl.Ex. 46 at 15, 18.) Obviously, Rockwood never told anyone at Biomet that Smith threatened to bring a gun to the annual shareholders' meeting. Biomet simply assumed that and altered the statement. Thus, contrary to *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), a case relied on by Biomet, the liability assessed to Biomet in this case derived from Biomet's own actions.

Finally, the evidence also supported a finding that Biomet did not take reasonable steps to determine the truth of Rockwood's statement. No one at Biomet seemed to care whether Rockwood took the statement seriously, because no one asked whether he did. Moreover, Biomet never called Smith to find out if he had made the statement or what he meant by it, even though Geurink testified that he did not know Smith to be violent. (Tr. vol. 4 at 81; Pl.Ex. 41 at 74–75.) As mentioned, Smith outright denied making any threat. (Tr. vol. 2, at 128–29.)

■ Regardless, Biomet changed Rockwood's statement and created a new defamatory statement. Because there was evidence that Biomet published the new defamatory statement, that it knew to be false—since it made part of it up—malice could easily have been found by a reasonable jury.

## C. Damages

Biomet also argues that Smith did not incur any damages as a result of Biomet's defamatory statement. To begin with, a communication is defamatory *per se* under well-settled common law rulings if it imputes criminal conduct. *Lovings v. Thomas*, 805 N.E.2d 442, 446 (Ind.Ct.App. 2004); *Rambo v. Cohen*, 587 N.E.2d 140, 145 (Ind.Ct.App.1992), *trans. denied;* Restatement (Second) of Torts § 570 (1977). When a communication is defamatory per se, the plaintiff is entitled to presumed damages "as the natural and probable consequence" of the per se defamation. *Elliott v. Roach*, 409 N.E.2d 661, 683 (Ind.Ct. App.1980). Thus, as the *Rambo* court put it, "The law presumes the plaintiff's reputation has been damaged, and the jury may award a substantial sum for this presumed harm, even without proof of actual harm." *Rambo*, 587 N.E.2d at 145. The statement at issue here imputes criminal conduct to Smith and is thus defamatory *per se.*

In considering whether to grant judgment as a matter of law, the "court must draw all inferences in favor of the nonmoving party." *Tart v. Ill. Power Co.*, 366 F.3d 461, 472 (7th Cir.2004) (citations omitted). It's for this reason that a party attacking a "jury verdict faces an uphill battle, for we will not set aside a jury verdict as a long as a reasonable basis exists in the record to support that verdict." *Haschmann v. Time Warner Entm't Co.*, 151 F.3d 591, 599 (7th Cir. 1998). Biomet has not won that battle on Smith's defamation claim.

The jury's verdict awarding Wayne Smith compensatory and punitive damages for defamation should not be disturbed. There was evidence introduced at trial that Biomet materially changed the statement that it had been told by Peter Rockwood and then, for no good reason, communicated the new defamatory statement to Smith's former customers and others. In addition, the evidence clearly permitted the jury to award punitive damages because there was evidence that Biomet knew the statement to be false—since it had materially changed it and added information concerning the annual shareholders' meeting—that no one, and certainly not Wayne Smith, had ever said. Accordingly, Biomet's renewed motion for judgment as a matter of law on the defamation claim must be denied.

## III. *Texas Sales Representative Act*

Biomet also urges the Court to find that it is entitled to judgment in its favor on Smith's claim under the Texas Sales Representative Act ("TSRA") because Biomet's final commission payment complied with the terms of its letter agreement with Smith. On this claim there can be no doubt that the evidence permitted the jury to find that Biomet improperly deducted commissions from Smith's final commission check. The jury's verdict in favor of Smith was not against the clear weight of the evidence. Accordingly, Biomet is not entitled to judgment as a matter of law.

The TSRA provides:

A principal who fails to comply with a provision of a contract under Section 35.82 relating to payment of a commission or fails to pay a commission as required by Section 35.83 is liable to the sales representative plus reasonable attorney's fees and costs.

Tex. Bus. & Com.Code § 35.84 (2004). The evidence established that on July 10, 2001, Smith contacted Biomet in writing and requested that an inventory of his Biomet products be performed that very day because he did not want to lose control of the inventory. (Tr. vol. 2, at 101; Pl. Ex. 17.) Smith testified, repeatedly, that he could not do an audit of the inventory

himself because once he was terminated he had no authority to access Biomet's inventory. (*See* Tr. vol. 2, at 158–59.) Biomet chose not to immediately perform an audit. (*Id.* at 102.)

In fact, the evidence was that one of Biomet's new distributors, Mike La-Grange, acknowledged that surgeries were performed for Smith's former clients on July 11, 2001, and July 13, 2001, using Biomet inventory already present in the hospital. (Pl.Ex. 42 at 38–40.) A reasonable jury could come to the conclusion that this inventory had to have been the Biomet inventory that Smith was responsible for up until July 11, 2001.

Further, Biomet's own Dave Montgomery also testified that a distributor usually has thirty days to reconcile the Biomet inventory against the audit figures, and that usually during that time frame the missing inventory is accounted for. (Tr. vol. 4, at 151–53.) A reasonable jury could conclude that had Smith been given the opportunity to assist with the inventory audit and to look for the missing items (which may have actually been used during surgeries for Biomet customers), the inventory would have been reconciled. But, Smith never had this opportunity.

On August 24, 2001, Smith received his final commission check from Biomet, containing a $13,906.50 deduction for inventory that Biomet said that it couldn't locate. (*Id.* at 105, 108.) One could reasonably conclude based on the evidence that 1) Smith requested that an immediate audit be completed on Biomet's inventory, but Biomet chose not to do it, 2) Biomet's new distributor who took over for Smith used the Biomet inventory and might have been responsible for the missing items, 3) Smith could not do an independent audit of the inventory because after his termination he did not have authority over Biomet's products, and 4) as a result, Biomet improperly deducted $13,906.50 from Smith's final

commission check in violation of the Texas Sales Representative Act. Accordingly, Biomet's renewed motion of judgment as a matter of law on this claim is denied.

## IV. *Jury Instructions and Verdict Form*

■ Biomet also argues that the Court's instructions to the jury and verdict form were in error and seriously prejudiced Biomet. Many of Biomet's arguments are perplexing; all are without merit for the reasons that follow. To begin with, under Federal Rule of Civil Procedure 51, when considering instructions proposed by the court, a party, in order to preserve the error, must state "distinctly the matter objected to and *the grounds of the objection.*" Fed.R.Civ.P. 51 (emphasis added). As the Seventh Circuit has stated: "The objection must be specific enough that the nature of the error is brought into focus. The party must also explain what is wrong with the proposed instruction; it is not enough to simply submit an alternative instruction." *Schobert v. Ill. Dep't of Transp.*, 304 F.3d 725, 729 (7th Cir.2002) (internal citations omitted). *See also Knox v. Indiana*, 93 F.3d 1327, 1333 (7th Cir.1996). The requirement of specificity in objections is not a technical game of "gotcha." Rather, it's a pragmatic rule that allows the judge to "be made aware of the error prior to instructing the jury, so that the judge can fix the problem." *Schobert*, 304 F.3d at 729–30.

### *Biomet's Proposed Instruction Nos. 24, 25, 27, and 28*

Biomet asserts that the Court's failure to give its proposed instruction Nos. 24, 25, 27, and 28 was plain error. The Court gave Defendant's instruction No. 24 as the Court's Instruction No. 20A in the Court's Final Jury Instructions. (*See* [Doc. 150].) Moreover, Biomet specifically withdrew its

proffered Instruction No. 28. (Tr. vol. 5, at 74.) Biomet's proposed instruction Nos. 25 and 27 dealt with defenses to the tortious interference with business relations claim, which this Court has now granted Biomet's renewed motion for judgment as a matter of law on, making any further discussion unnecessary.

**Instruction No. 22**

Instruction No. 22 accurately stated the law of compensatory damages for a tortious interference with business relations claim. *See* Restatement (Second) of Torts § 774A (damages include "(a) the pecuniary loss of the benefits of the contract or the prospective relation; (b) consequential losses for which the interference is a legal cause; and (c) emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference.") Biomet only objected to any reference of emotional distress being included in the jury instruction, and the Court actually *sustained* Biomet's objection. (*See* Tr. vol. 5, at 50, 79.)

**Instruction No. 31**

Instruction No. 31 correctly stated that the defamatory statement at issue, which implicated criminal conduct, was defamatory as a matter of law. *Smith,* 238 F.Supp.2d at 1046. This instruction is in accordance with the Indiana Pattern Jury Instructions. In fact, the Court got this language from *Biomet's* proposed instruction No. 54. Instruction No. 30 instructed the jury that in order to find Biomet liable for defamation, Smith had to prove the required four elements by a preponderance of the evidence. Taking the instructions as a whole, it is clear that Instruction No. 31 did not "usurp" the role of the jury by directing a verdict against Biomet.

**Instruction No. 32**

Biomet's beef with Instruction No. 32 is that the Court failed to identify the specific defamatory statement at issue in the case. Biomet waived any objection to In-struction No. 32 because it did not object at trial to it. (*See* Tr. vol. 5, at 69.) Biomet is wrong in any event. Instruction No. 30 clearly and explicitly identified the defamatory statement at issue, stating in relevant part, "To recover on his claim of defamation, Mr. Smith must prove the following elements by a preponderance of the evidence: (1) that Biomet made the following statement: that Wayne Smith had said that he was going to go to Biomet's annual shareholders' meeting in Warsaw and settle matters with a gun." *See* Instruction No. 30.

**Instruction No. 27**

Biomet claims that Instruction No. 27 was "plainly erroneous" and did not "accurately reflect the law." (Biomet's Mem. at 31). Yet Biomet never objected to the instruction during trial. (Tr. vol. 5, at 80.) Instruction No. 27 is an accurate statement of the law in any event.

**Instruction Nos. 23, 24, 33, and 34**

The only objection that Biomet voiced at trial to Instruction No. 23 was that "it *refers to human failing with the Defendant, who is a corporation.*" (Tr. vol. 5, at 52.) Read in conjunction with earlier instructions the Court found that it would be clear to the jury that corporations act through their agents and overruled Biomet's objection. Any newly raised objection is therefore waived. As to Instruction No. 24, the Court sustained the only objection raised by Biomet. (*See id.* at 52). Accordingly, any additional objections were waived. Instruction No. 33 is a proper statement of the law and was Biomet's proposed instruction No. 11. It is taken directly from Indiana Pattern Jury Instruction No. 35.17. Not surprisingly, inasmuch as it was *Biomet's* proposed instruction, it did not object to Instruction No. 33 at trial. (*See id.* at 69.) Finally, Instruction No. 34 as given represented an altered instruction that incorporated

changes made after the Court *sustained* the objection of Biomet to proposed instruction No. 34. (*See id.* at 69–71.)

### Verdict Form

Lastly, the Court's decision not to use the 10–page, 46–question special verdict form proposed by the Defendant was not error. A general verdict form where the jury simply makes a finding as to liability on each claim, and additional damage findings if applicable, suffices. *See* Fed. R.Civ.P. 49(a) (the Court "may use such other method of submitting the issues and requiring the written findings thereon as it deems most appropriate") and 49(b) (the Court may use a general verdict); *see also Perzinski v. Chevron Chem. Co.*, 503 F.2d 654, 660 (7th Cir.1974) ("A district court has considerable discretion as to the nature and scope of the issues to be submitted to the jury in the form of special verdict questions under Rule 49(a)").

### V. *Evidentiary Errors*

Biomet also seeks a new trial based on the Court's purported erroneous evidentiary rulings. All of Biomet's evidentiary arguments were considered and ruled upon by the Court prior to or during trial. Accordingly, Biomet's motion for a new trial on these evidentiary grounds is denied for the reasons previously set forth by the Court.

### CONCLUSION

For the foregoing reasons, Biomet's renewed motion for judgment as a matter of law [Doc. 167] is **GRANTED IN PART AND DENIED IN PART**. Because there was no legally sufficient evidentiary basis for a reasonable jury to find in favor of Wayne Smith and against Biomet, Inc. on Wayne Smith's claim of tortious interference with business relations, **JUDGMENT IS ORDERED** in favor of Counter–Defendant Biomet, Inc. and against Counter–Plaintiff Wayne Smith on his tortious in-

terference with business relations claim only. Pursuant to Rule 50(c)(1), because the dispositive facts are uncontroverted and the verdict was against the clear weight of the evidence on the tortious interference with business relations claim, Biomet's alternative request for a new trial on this claim is **CONDITIONALLY GRANTED**.

Biomet's renewed motion for judgment as a matter of law on Smith's defamation claim and Texas Sales Representative Act claim is hereby **DENIED**. Biomet's alternative request for a new trial on each of these claims is also hereby **DENIED**.

Furthermore, Wayne Smith's Motion for a New Trial [Doc. 160] is **DENIED** for the reasons previously stated in this order. Finally, in light of this Order, Biomet's Motion to Review the Clerk's Notice of Taxation of Costs [Doc. 170] is hereby **GRANTED**.

**SO ORDERED.**